**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| B AND T SUPPLIES, INC. d/b/a B AND T SUPPLY d/b/a BIGGEST BOOK.COM, TZVI ODZER, RKDK INC. and GELATO ON HUDSON LLC d/b/a HAAGEN DAZS, ASIA STAR BROADCASTING INC., DANIEL SHAH, MH MARKETING SOLUTIONS GROUP, INC., MICHAEL HELLER, TOURMAPPERS NORTH AMERICA, LLC, JULIE KATZ, THE PERFECT IMPRESSION INC., and SUSAN ABRAHAMS *individually and on behalf of those similarly situated*, | Civil Action No.: 1:23-cv-11241 |
| Plaintiffs, | |
| v. | |
| GEMJ CHEBHEAR GRAT, LLC, JOSEF CHEHEBAR, and ISAAC SHEHEBAR, | |
| Defendants. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

**WHITE AND WILLIAMS LLP**
Shane R. Heskin
Alex D. Corey
7 Times Square
New York, New York 10036
Tel:  (212) 244-9500
heskins@whiteandwilliams.com
coreya@whiteandwilliams.com

**Almeida Law Group LLC**
David S. Almeida, Esq.
849 W. Webster Avenue
Chicago, Illinois 60614.
(312) 576-3024
david@almeidalawgroup.com

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND ................................................................................................... 3

ARGUMENT ........................................................................................................................... 6

    I.    Plaintiffs Satisfy the Pleading Standard.............................................................. 6

    II.    Plaintiffs' Claims Are Timely and Neither The *Rooker-Feldman*
        Nor *Res Judicata* Doctrines Bar Plaintiffs' Claims. ........................................ 7

    III.    The PSLRA Has No Bearing on Plaintiffs' Claims. ........................................ 10

    IV.    Plaintiffs Have Adequately Alleged Four Distinct Predicate Acts. .............................. 12

        a.    Plaintiffs alleged the predicate act of collection of unlawful debt. ............................... 12

            i.    The MCA Agreements PA choice of law provision is unenforceable. ...................... 12

            ii.    The MCA Agreements are substantively usurious loans............................................ 17

        b.    Plaintiffs adequately pled their remaining racketeering activities............................ 22

CONCLUSION....................................................................................................................... 25

# TABLE OF AUTHORITIES

Page(s)

**CASES**

*421-A Tenants Ass'n v. 125 Court St. LLC*,
  760 Fed. Appx. 44 (2d Cir. 2019)..............................................................................7

*Angermeir v. Cohen*,
  14 F. Supp. 3d 134 (S.D.N.Y. 2014)...................................................................24, 25

*Baisch v. Gallina*,
  346 F.3d 366 (2d Cir. 2003)......................................................................................6

*Bankers Trust Co. v. Rhoades*,
  859 F.2d 1096 (2d Cir. 1988)....................................................................................7

*Brack v. Omni Loan Co., Ltd.*,
  164 Cal. App. 4th 1312 (Cal. Ct. App. 2008) ..........................................................16

*Cash America Net of Nevada, LLC v. PA Dept. of Banking*,
  8 A.3d 282 (Pa. 2010) ..............................................................................................14

*City of New York v. Bello*,
  579 Fex. Appx. 15, 17 (2d Cir. 2014) ........................................................................6

*Cruden v. Bank of New York*,
  957 F.2d 961 (2d Cir. 1992).......................................................................................8

*Crystal Springs Capital Inc. v. Big Thicket Coin, LLC*,
  220 A.D.3d 745 (2d Dep't 2023) .............................................................................19

*D. Penguin Bros. v. City Nat'l Bank*,
  587 Fed. Appx. 663 (2d Cir. 2014)............................................................................6

*D'Addario v. Platt*,
  75 F.4th 86 (2d Cir. 2023) .......................................................................................12

*Davis v. Richmond Capital Group*,
  194 A.D.3d 516 (1st Dep't 2021) .......................................................................19, 20

*Ellison v. Evergreen Cemetery*,
  266 N.J. Super. 74 (Super. Ct. 1993).......................................................................16

*Fleetwood Servs, LLC v. Complete Bus. Sols. Grp.*,
  374 F. Supp. 3d 361 (E.D. Pa. 2019) ...............................................13, 14, 15, 16, 19

*Fleetwood Servs., LLC v. Richmond Capital Grp. LLC*,
  2023 U.S. App. LEXIS 14241 (2d Cir. June 8, 2023) ...............................................18

*Friedman v. Markowits*,
    2017 N.Y. Misc. LEXIS 5117 (Sup. Ct. Feb. 23, 2017)........................................................10

*G Companies Management, LLC v. LREP Arizona, LLC*,
    88 Cal. App. 5th 342 (Ct. App. 4th Dist. 2023).................................................................16

*H.J. Inc. v. Northwester Bell Tel. Co.*,
    492 U.S. 229 (1989)...............................................................................................................24

*Haymount Urgent Care PC v. GoFund Advance, LLC*,
    609 F. Supp. 3d 237 (S.D.N.Y. 2022)..........................................................................19, 20, 21

*In re Stone St. Capital, LLC*,
    2013 Mass. Super. LEXIS 45 (Super. Ct. May 10, 2013) .....................................................16

*Jersey Palm-Gross v. Paper*,
    658 So. 2d 531 (Fl. 1995) ....................................................................................................15

*Klehr v. A.O. Smith Corp.*,
    521 U.S. 179 (1997).................................................................................................................7

*Lateral Recovery, LLC v. Cap. Merch Servs., LLC*
    632 F. Supp. 3d 402 (S.D.N.Y. 2022)..............................................................................7, 19

*Lateral Recovery LLC v. Queen Funding LLC*,
    2022 U.S. Dist. LEXIS 129032 (S.D.N.Y. July 20, 2022) ...............................................19, 20

*LG Funding, LLC v. United Senior Properties of Olathe, LLC*,
    181 A.D.3d 664 (2d Dep't 2020) ....................................................................................19, 20

*Madden v. Midland Funding, LLC*,
    237 F. Supp. 3d 130 (S.D.N.Y. 2006)..................................................................................17

*Mezzonen, S.A. v. Wright*,
    1999 U.S. Dist. LEXIS 17625 (S.D.N.Y. Nov. 16, 2019) .....................................................24

*New Y-Capp v. Arch Cap. Funding LLC*,
    2022 U.S. Dist. LEXIS 180309 (S.D.N.Y. Sept. 30, 2022)...........................................9, 10, 20

*New York City Transit Aut. v. Morris J. Eisen, P.C.*,
    276 A.D.2d 78 (1st Dep't 2000) ...........................................................................................9

*Newin Corp. v. Hartford Acc. & Indem. Co.*,
    37 N.Y.2d 211 (1975) ...........................................................................................................9

*PA Dept. of Banking v. NCAS of Del., LLC*,
    948 A.2d 752 (Pa. 2008) ......................................................................................................14

*People v. Richmond Capital Group LLC*,
    2023 NYLJ LEXIS 2487 (Sup. Ct. Sept. 20, 2023)............................................................20

*Regency Club at Wallkill, LLC v. Bienish*,
    95 A.D.3d 879 (2d Dep't 2012) .....................................................................................10

*Salinas v. United States*,
    522 U.S. 52 (U.S. 1997)....................................................................................................6

*Samson Lending LLC v. Greenfield Mgt. LLC*,
    80 Misc. 3d 1023 (Sup. Ct. 2023)...................................................................................16

*Serin v. Northern Leasing Sys.*,
    2009 U.S. Dist. LEXIS 130899 (S.D.N.Y. Dec. 15, 2009) ...................................................24

*Stolow v. Greg Manning Auctions Inc.*,
    80 F.App'x 722 (2d Cir. 2003) ..........................................................................................7

*Szarejko v. Great Neck School Dist.*,
    795 F. Supp. 81 (E.D.N.Y. 1992) ......................................................................................8

*Tenamee v. Schmukler*,
    438 F. Supp. 2d 438 (S.D.N.Y. 2006)...........................................................................22, 23

*Turner v. Aldens, Inc.*,
    179 N.J. Super. 596 (Super. Ct. App. Div. 1981) ..................................................................17

*United States v. Grote*,
    961 F.3d 105 (2d Cir. 2020).............................................................................................25

*Uviles v. RYS Int'l Corp.*
    443 F. Supp. 2d 233 (D.P.R. 2006)...................................................................................12

*Watral v. Silvernails*,
    177 F. Supp. 2d 141 (E.D.N.Y. 2001) .............................................................................24

*Wright v. Gerald Gardner Wright P.C.*,
    160 A.D.3d 684 (2d Dep't 2018) .....................................................................................10

**STATUTES**

CA Stats. 1919 p. lxxxiii, § 2.............................................................................................14

Fla. Stat. § 687.071 ............................................................................................................14

N.J. Stat. § 2C:21-19..........................................................................................................14

N.Y. Penal Law § 190.40....................................................................................................14

PSLRA ........................................................................................................................11, 12

RICO .......................................................................................................... *passim*

RICO Amendment ....................................................................................................11, 12

Securities Exchange Act of 1934 § 10(b) .................................................................12

UCC ...........................................................................................................5, 11, 15

## OTHER AUTHORITIES

California Constitution p. lxxxiii § 3, and Article XV, § 1 ............................................14

Restatement (Second) of Conflict of Laws § 187(2) ...................................................13

FRCP Rule 8(a) ...............................................................................................................6

Rule 10b-5 ......................................................................................................................12

Plaintiffs B&T Supplies, Inc. d/b/a B&T Supply d/b/a Biggest Book.com ("B&T"), Tzvi Odzer ("Odzer"), RKDK Inc. and Gelato on Hudson LLC d/b/a Haagen Dazs franchises, Asia Star Broadcasting Inc., Daniel Shah, MH Marketing Solutions Group, Inc. ("MH Marketing"), Michael Heller ("Heller"), TourMappers North America LLC, Julie Katz, the Perfect Impression Inc., and Susan Abrahams ("Plaintiffs"), respectfully submit this Memorandum of Law in opposition to Defendants' GemJ Chehebar Grat, LLC, Josef Chehebar ("Josef") and Isaac Shehebar (collectively, "Defendants") motion to dismiss Plaintiffs' Amended Complaint (the "Motion").

## PRELIMINARY STATEMENT

Defendants funneled nearly $50 million to a RICO Enterprise run by the Gambino crime family and sought to profit off the backs of struggling small businesses all across the country. Defendants did so despite knowing that the Enterprise was running an illegal loansharking scheme and sending Gambino soldiers to collect upon these unlawful debts when their victims did not pay. Defendants knew of the lengthy criminal backgrounds of the Enterprise members they conspired with and chose to actively participate in the scheme despite their full knowledge and extensive due diligence. Two grand jury indictments and an SEC enforcement action later, Defendants now contend that this RICO class action should be dismissed in its entirety based on meritless procedural grounds that are contrary to the facts and controlling law.

Defendants' procedural arguments prove the futility of their request. For example, Defendants contend the entire Amended Complaint[1] is barred by RICO's four-year statute of limitations. At the same time, Defendants argue that the claims are barred by the *Rooker-Feldman* doctrine due to the filing of state court confessions of judgment. The argument has two significant

---

[1] The original complaint was filed on December 28, 2023. [ECF No. 1]. On June 10, 2024, Defendants moved to dismiss the original complaint. [ECF No. 29]. On June 28, 2024, Plaintiffs filed the Amended Complaint, [ECF No. 38], which resulted in the Court denying Defendants' original motion to dismiss as moot. [ECF No. 40].

problems. *Both state court judgments—Katz and Heller—were vacated by the SEC court-appointed receiver in December 2023*. And the argument made by Defendants is actually correct as those Plaintiffs could not have brought this action unless and until those judgments were vacated. Simply put, the statute of limitations did not begin to run until those state court judgments were vacated in December 2023. In fact, Plaintiffs were not even allowed to vacate those judgments because a litigation stay was put in place through the SEC Action in July 2020. But even setting aside these fatal flaws, Defendants also ignore numerous allegations of new and separate overt acts occurring well within the four years since the original complaint was filed.

Defendants also make cursory arguments that the Enterprise's MCA Agreements were not, in fact, loans while simultaneously failing to even address the substance of the MCAs or the factual allegations in the Amended Complaint detailing how the Enterprise treated their MCAs as full recourse loans through the use of collateral, personal guarantees, forged confessions of judgment and a Gambino soldier who threatened the lives of wives and children if their victims did not pay. Defendants also entirely ignore the long line of precedent within this Circuit—including from the Second Circuit—finding that the sham MCA agreements, like here, are absolutely repayable loans that constitute the collection of an unlawful debt under RICO.

Instead, Defendants try to hide behind the MCA Agreement's Pennsylvania choice-of-law provision to argue that there can be no usury. Once again, Defendants ignore directly contrary precedent holding that the Enterprise could not circumvent other states' strong public policies against usury through the swipe of a pen. Indeed, Defendants do not even address the fact that the Amended Complaint presents considerable evidence that CBSG is, in reality, a Florida entity that selected a Pennsylvania choice-of-law provision for the explicit purpose of trying to circumvent Florida's and other state's usury laws. Defendants also attack Plaintiffs' remaining racketeering

activities of obstruction of justice and extortion—while leaving wire fraud undisturbed—based on the argument that RICO can only be established through open-ended continuity when, as alleged and recognized by our Supreme Court, RICO can also be alleged to have occurred close ended when numerous predicate acts occurred over several years. And the only reason it is now a close ended Enterprise is because the key Enterprise members are now in federal prison.

Finally, Defendants' assertion that securities fraud cannot constitute racketeering activity is correct.  But the Amended Complaint does not assert securities fraud; rather, Plaintiffs assert collection of unlawful debt and wire fraud.  The Motion should be denied in its entirety.

## **FACTUAL BACKGROUND**

From at least 2016 to 2020, Defendants were an integral part of a RICO enterprise (the "Enterprise") involving Complete Business Solutions Group, Inc. ("CBSG") and the RICO Person mastermind behind the Enterprise, Joseph LaForte ("LaForte"). *See* ECF No. 38 ¶¶ 1-6. Specifically, during this four-year span, Defendants provided more than $48 million in seed money to the Enterprise for the explicit and knowing purpose of funding usurious loans offered by CBSG to victim merchants like Plaintiffs and countless others across the country. *Id*. ¶¶ 4-7. Unlike other investors in the Enterprise who may have been duped into providing funds, the Chehebars gave capital "in their private capacity as insiders who had unfettered access to the Enterprise's books and records and did so with full knowledge of LaForte's vast criminal background . . . ties to organized crime, and the unlawful loan sharking scheme." *Id*. ¶ 8.

Defendants were paid handsomely for their assistance to the Enterprise. They received from the Enterprise the "Chehebar family rate" of 25% interest on the criminally usurious loans they provided the Enterprise." *Id*. ¶ 10. Defendants also received a part of the Enterprise's profits as evidenced by consulting agreements entered into and text messages exchanged between Defendants and the Enterprise. *Id*. ¶¶ 11-12. Defendants knew the Enterprise offered criminally

usurious loans because their review of the Enterprise's records before investing included reviewing the Enterprise's marketing materials in which the Enterprise dropped the mask and admitted that its merchant cash advance agreements ("MCA Agreements") where actually usurious loans charging more than 100% interest annually. *Id.* ¶¶ 15-21; Ex. C.

Because Defendants knew the CBSG loans they funded had annual interest rates in excess of 100%, they also knew that those rates violated the criminal usury statutes of numerous states, including Florida (where CBSG was located), New Jersey (where Haagen Dazs, MH Marketing and Heller are located), New York (where B&T and Odzer are located), Massachusetts (where TourMappers and Katz are located), and California (where Perfect Impression and Abraham are located). *Id.* ¶¶ 179-188. These usurious loans were issued to Plaintiffs as recently as July 17, 2020, with payments being made every day or week thereafter until the usurious loans were repaid. *Id.* ¶ 135. Several Plaintiffs have had to keep making payments on CBSG's usurious loans originally funded by Defendants through 2022. *Id.* ¶¶ 175-176, well within four years of the filing of the original complaint on December 28, 2023. *See* ECF No. 1.

Unlawful collection of debt, however, is just one of the several racketeering activities the Enterprise engaged in for which Defendants are liable. Notably, Defendants also conspired in the Enterprise's wire fraud activities. *Id.* ¶¶ 71-77. As insiders, Defendants understood that CBSG's MCA Agreements were loans. *Id.* Ex. C. Defendants also understood that the MCA Agreements fraudulently disclaimed that the agreements were loans when they were sent to merchants via interstate electronic mail for merchant execution. *Id.* ¶¶ 71-76. Defendants were also intimately aware of the Enterprise's scheme to illegally evade taxes, which directly benefitted Defendants as they shared in the Enterprise's profits. *Id.* ¶ 73. Defendants were also aware that CBSG was not a

Pennsylvania entity but rather included a Pennsylvania choice of law provision in its MCA Agreements in order to avoid the usury laws of its actual domestic State of Florida. *Id*. ¶ 72.

Defendants also benefitted from and are liable for the Enterprise's racketeering activity consisting of extortionate collect of credit—which increased the Enterprise's profits—thereby enriching Defendants who shared in those profits. *Id*. ¶¶ 78-89. The Enterprise's extortionate tactics included sending felons to merchants' business and homes to threaten the merchants into making payment. *Id*. ¶¶ 86-89. Other tactics included sending death threats through texts and phone calls to merchants, forging confessions of judgment to obtain fraudulent judgments, sending out UCC lien notices to merchants' friends and family, and taking as collateral merchants' personal assets through threats of violence. *Id*. ¶ 78. These extortionate collection efforts were integral in how the Enterprise ensured its usurious loans were absolutely repayable. *Id*. ¶¶ 78-89.

Finally, the Enterprise also committed the racketeering activities of obstruction of justice, conspiracy to obstruct justice, and perjury, which Defendants are also liable for as Enterprise co-conspirators. At its core, the Enterprise obstructed justice, as Defendants knew, by fraudulently labeling their usurious loans as MCA Agreements and fraudulently identifying itself as a Pennsylvania entity when, for tax purposes, the Enterprise consistently maintained its principal place of business was Florida. *Id*. ¶¶ 93-97. Defendants were also aware that the Enterprise hid LaForte's true involvement through use of aliases and misleading organizational disclosures. *Id*. ¶¶ 97-98. When certain Enterprise members were deposed in civil lawsuits relating to their usury and other racketeering acts, the witnesses committed perjury to conceal the identity of the Enterprise's co-conspirators, like Defendants. *Id*. ¶¶ 99-114.

As detailed in the Amended Complaint, the racketeering activities committed by the Enterprise with Defendants' material assistances ruined the lives and businesses of Plaintiffs, and

this harm continues to the present. *Id.* ¶¶ 115-176. Haagen Dazs, ASB and Shah made payments on usurious loans through July 22, 2020, and a $275,000 mortgage remains on Shah's home from this usurious debt. *Id.* ¶¶ 132-133. Odzer and B&T have paid over $1 million direct to Enterprise members, such as LaForte and his brother Jimmy—a made-man—since July 24, 2020. *Id.* ¶ 142-144. Heller lost his company MH Marketing, had their personal bank accounts frozen, and had to file for Chapter 13 bankruptcy, leaving their home presently at risk of foreclosure. *Id.* ¶¶ 145-166. To this day, Heller cannot sell his home due to the existing CBSG mortgage—that admits the MCA is a loan. Perfect Impressions and Abrahams were forced to continue paying off CBSG's usurious loans through August 2022 in the amount of at least $560,990. *Id.* ¶¶ 173-176.

<u>**ARGUMENT**</u>

**I.**     **Plaintiffs Satisfy the Pleading Standard.**

To state a claim for non-fraud RICO conspiracy, "a plaintiff's complaint need satisfy only the 'short and plain statement' standard of [FRCP] Rule 8(a)." *D. Penguin Bros. v. City Nat'l Bank, 587 Fed. Appx. 663, 666 (2d Cir. 2014)*. "[A] party 'may be liable for RICO conspiracy even though he was incapable of committing the substantive offense." *City of New York v. Bello, 579 Fex. Appx. 15, 17 (2d Cir. 2014)*. Consequently, "the requirements for RICO conspiracy charges under § 1962(d) are less demanding." *Baisch v. Gallina, 346 F.3d 366, 376 (2d Cir. 2003)*. To be liable, a "conspirator must intend to further an endeavor which, if completed, would satisfy all of the elements of a substantive criminal offense, but it suffices that he adopts the goal of further or facilitating the criminal endeavor" by knowing and agreeing "facilitate the scheme." *Salinas v. United States, 522 U.S. 52, 65-66 (U.S. 1997)*.

Here, Plaintiffs have sufficiently alleged that Defendants knew and agreed to facilitate several of the illicit racketeering activities that made up the Enterprises' illicit activity including, but not limited to, actively and knowingly participating in their collection of unlawful debt, wire

fraud, and tax evasion. ECF No. 38 ¶¶ 65-77. As conspirators, Defendants are also liable for the Enterprise's extortion, obstruction of justice and perjury and related racketeering acts as alleged in the Amended Complaint. *Id*. ¶¶ 78-114. Defendants' Motion opts to attack the Amended Complaint on procedural grounds but offer little in their papers to refute the substantive allegations as to the racketeering activity they knew about and facilitated. *See generally* ECF No. 44.

## II.    Plaintiffs' Claims Are Timely and Neither The *Rooker-Feldman* Nor *Res Judicata* Doctrines Bar Plaintiffs' Claims.

Defendants argue that Plaintiffs' claims are time-barred under RICO's four-year statute of limitations because they discovered or should have discovered the RICO injury of collection of unlawful debt before December 28, 2019, four years before the original complaint was filed. *Id*. at 4-7. This argument was squarely rejected in *Lateral Recovery, LLC v. Cap. Merch Servs., LLC* 632 F. Supp. 3d 402, 450 (S.D.N.Y. 2022), in which the Court held that the "RICO statute of limitations is satisfied so long as an overt act that is part of the violation and injures the plaintiff occurs within the four years prior to the filing of a complaint asserting the RICO claims." *Id.* (citing *Stolow v. Greg Manning Auctions Inc.*, 80 F.App'x 722, 725-26 (2d Cir. 2003) and *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 188-89 (1997)); *see also* *421-A Tenants Ass'n v. 125 Court St. LLC*, 760 Fed. Appx. 44, 50 (2d Cir. 2019) ("Plaintiff may bring a civil RICO claim for any "separate and independent injuries . . . discoverable within the four-year 'window' before suit was filed," even if the underlying RICO violations fall outside of the statute of limitations"); *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1103 (2d Cir. 1988) (holding plaintiff has "right to sue when a new and independent injury is incurred from the same [RICO] violation").

As Defendants concede, four years from the original complaint is December 23, 2019. ECF No. 44 at 4. Defendants, however, ignore the numerous overt acts and RICO racketeering activity Plaintiffs allege occurred *after* December 23, 2019 including, but not limited to:

(i)      Haagen Dazs, ASB and Shah have been making payments on CBSG's usurious loans through July 22, 2020, ECF No. 38 ¶ 133;

(ii)     B&T Supply and Odzer made payments on CBSG usurious loans between July 24, 2020 and August 7, 2020 totaling more than $1 million, *Id*. ¶¶ 142-144; and

(iii)    Perfect Impressions and Abrahams entered into a usurious loan with CBSG on February 27, 2020, and continued making payments through 2022. *Id* ¶ 170.

There is simply no basis to dismiss the Amended Complaint on any statute of limitations grounds because even Defendants cannot contest that the Complaint alleges multiple overt acts that occurred within the four years from filing the original complaint, including entering into a usurious loan. *See also Cruden v. Bank of New York*, 957 F.2d 961, 977 (2d Cir. 1992) ("Each time plaintiff discovers or should have discovered an injury caused by defendant's violation of § 1962, a new cause of action arises as to that injury, regardless of when the actual violation occurred").

Even assuming the Amended Complaint did not allege overt acts within the statute of limitations, the statute of limitations for claims against CBSG and its coconspirators have been tolled since August 13, 2020, by order in the SEC Action staying all litigation against CBSG. *See* Declaration of Shane Heskin ("Heskin Decl.") Ex. E. This toll was only recently lifted as certain confessions of judgments against Plaintiffs—such as Tourmappers, Katz, MH Marketing and Heller—were vacated in December 2023. *Id*. Exs. C and D. The fact that the litigations were stayed naturally tolls the statute of limitations. *See Szarejko v. Great Neck School Dist.*, 795 F. Supp. 81, 83 n. 2 (E.D.N.Y. 1992) (tolling statute of limitations where stayed by court order).

Defendants' Motion misses the point by arguing that the *Rooker-Feldman* doctrine and *res judicata* bar Plaintiffs' claims by arguing the existence of these confessions of judgment—many of which have been recently vacated—preclude Plaintiffs from litigating their instant claim. ECF No. 44 at 19-22. Plaintiffs' Amended Complaint does not seek to vacate any confessions of judgment. *See generally* ECF. No. 38. Rather, the Amended Complaint's allegations concerning

confessions of judgment underscore the Enterprise's overall scheme to collect on unlawful debt and to commit wire fraud by filing fraudulent confessions of judgment. *See id*. ¶¶ 24, 68-69, 75-78, 153, Ex. G (sample forged confession of judgment).

*Res judicata* also does not apply where "the alleged perjury or fraud in the underlying action was 'merely a means to the accomplishment of a larger fraudulent scheme' which was 'grater in scope than the issues determined in the prior proceeding.'" *Id*. (citing *Newin Corp. v. Hartford Acc. & Indem. Co.*, 37 N.Y.2d 211, 217 (1975)); *New York City Transit Aut. v. Morris J. Eisen, P.C.*, 276 A.D.2d 78, 88 (1st Dep't 2000) (allowing party to pursue claims because "an exception exists where the perjury is a means for the accomplishment of a larger fraudulent scheme. An action for damages in not precluded in that circumstance").

It is also well recognized that "[t]he *Rooker-Feldman* doctrine does not apply to a vacated state court judgment[.]" *New Y-Capp v. Arch Cap. Funding LLC*, 2022 U.S. Dist. LEXIS 180309, *3 (S.D.N.Y. Sept. 30, 2022).  Here, all applicable confessions of default have been vacated. *See* Heskin Decl. Exs. C and D. "Since the one identified state court judgment in this case has been vacated, the *Rooker-Feldman* doctrine does not apply." *New Y-Capp*, at *3. Nor does *res judicata* apply to vacated confessions of judgment. *See, e.g.*, *Friedman v. Markowits*, 2017 N.Y. Misc. LEXIS 5117, *8 (Sup. Ct. Feb. 23, 2017).

Finally, to the extent confessions of judgment are even relevant to this action through either the *Rooker Feldman* or *res judicata* doctrines, there is a well-recognized exception to the enforceability of confessions of judgment that were the product of fraud. *See, e.g.*, *Regency Club at Wallkill, LLC v. Bienish*, 95 A.D.3d 879, 879 (2d Dep't 2012); *Wright v. Gerald Gardner Wright P.C.*, 160 A.D.3d 684, 686 (2d Dep't 2018) ("the intervenor submitted clear, positive, and satisfactory evidence of fraud requiring that the judgment by confession be vacated").

Although all confessions of judgments have been vacated—the only confession of judgment in the record is the one B&T and Odzer signed as part of the MCA Agreement Defendants—*but has not been filed*. *See* ECF. No. 44-2 at 18.  In that confession of judgment, the MCA Agreements are fraudulently described as "the Agreement for the Purchase and Sale of Future Receivables."  *Id.*  The Enterprise and Defendants knew this statement was fraudulent because their own internal correspondence and reviewed marketing materials all described the MCA Agreements as loans.  ECF No. 38 ¶¶ 14-27; Ex. C.

At the end of the day, Plaintiffs allege specific overt acts within the four years prior to the original complaint being filed, which defeats Defendants' statute of limitations argument.  Even if it did not, the litigation stay tolled the statute of limitations until the confessions of judgment were recently vacated.  Because these confessions of judgment have been vacated and were the product of fraud individually and part of an overall scheme by the Enterprise, they are further inapplicable to the doctrines of *Rooker-Feldman* and *res judicata*.

### III.    The PSLRA Has No Bearing on Plaintiffs' Claims.

Defendants next argue that Plaintiffs' RICO conspiracy is barred by Section 107 of the Private Securities Litigation Reform Act ("PSLRA") whereby "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." ECF No. 44 at 7. But this "RICO amendment" has absolutely nothing to do with Plaintiff's conspiracy claim, which is premised on four racketeering activities that have <u>nothing</u> to do with securities fraud, namely: (1) collection of unlawful debt; (2) wire fraud relating to the transmission of fraudulently described MCA Agreements and fraudulent confessions of judgment filed via interstate electronic service; (3) extortionate collection practices premises on threats and UCC abuses; and (4) obstruction of justice and perjury.  ECF No. 38 ¶¶ 64-114.  None of these racketeering activities involve securities fraud, thus Defendants opt to grasp at incidental

mentions in the Complaint of the SEC action against CBSG, none of which are germane to Plaintiffs' factual allegations for its cause of action for RICO conspiracy.

Defendants also conflate the fact that the Chehebars were *insider investors* in the Enterprise's scheme with illogical conclusion that "[b]ecause the Chehebars' alleged wrongful conduct was undertaken 'in connection with' the fraudulent purchase or sale of securities, the RICO Amendment precludes Plaintiffs' RICO claims."  ECF No. 44 at 9.  This argument fails, however, because there is nothing in the complaint alleging that Plaintiffs' claims or Defendants' actions with respect thereto have anything to do with securities fraud.  The Defendants are simply adding allegations of securities fraud against themselves in their own Motion to try and taint the Amended Complaint with securities fraud allegations where none exists. Indeed, as Defendants know by their own attachment of the SEC complaint, that action <u>does not</u> concern unlawful debt collection, the type of wire fraud alleged here, extortion collection tactics, nor obstruction of justice and perjury, all of which are alleged in the Amended Complaint and are absent from the SEC action.  *Compare* ECF 38 (Amended Complaint) ¶¶ 64-11 *with* ECF 44-1 (SEC Complaint). Instead, those allegations are contained in two federal Grand Jury indictments—for RICO.

Notably, Defendants' Motion is silent as to the test courts apply to determine whether a RICO claim is barred by the PSLRA.  *D'Addario v. Platt*, 75 F.4th 86, 99-100 (2d Cir. 2023) ("A civil RICO claim is barred by the RICO Amendment if the plaintiff alleges 'conduct that would have been actionable as fraud in the purchase or sale of securities.  To determine whether a plaintiff has alleged conduct that satisfies this description, courts have looked to section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5").  There is nothing in the Amended Complaint that can be remotely construed as pleading fraud "in connection with the purchase or sale of any security" which is a required element for both Rule10b-5 and therefore application of the RICO

Amendment.  *Id*.  Defendants are simply injecting facts outside the scope of the Amended Complaint into their motion papers about securities fraud that do not exist in the Complaint and cannot be used to invoke the RICO amendment.[2]

### IV.    Plaintiffs Have Adequately Alleged Four Distinct Predicate Acts.

#### a.    Plaintiffs alleged the predicate act of collection of unlawful debt.

Defendants argue that Plaintiffs failed to allege unlawful collection of debt because CBSG's MCA Agreements "are either (1) bona fide sales of accounts receivable, or (2) loans not subject to usury restrictions under Pennsylvania law."  ECF No. 44 at 12.  Neither of these arguments is persuasive given the Plaintiffs' and CBSG's states of residences' strong public policies against usury and because the MCA Agreements bear all the hallmarks of a loan.

#### i.    *The MCA Agreements PA choice of law provision is unenforceable.*

As an initial matter, the issue of whether CBSG's Pennsylvania's choice-of-law provision in its MCA Agreements can be used to dismiss a merchant's claim for unlawful collection of debt has already been answered in the negative.  In *Fleetwood Servs, LLC v. Complete Bus. Sols. Grp., 374 F. Supp. 3d 361 (E.D. Pa. 2019)*, CBSG raised the same argument as Defendants do now, namely that "Pennsylvania law applies to claims arising from the Factoring Agreement, [and therefore] all but a few of Plaintiffs' causes of action must be dismissed (i.e., those that rely on finding the Factoring Agreement constituted a loan with usurious interest under Texas law)."  *Id.*

---

[2] Moreover, case law makes clear that even if the Amended Complaint contained some portion of securities fraud as racketeering activity, the appropriate response to dismiss those predicate acts, not the non-securities fraud racketeering activity allegations.  *Uviles v. RYS Int'l Corp. 443 F. Supp. 2d 233, 237-239 (D.P.R. 2006)* (dismissing allegations premised on securities fraud but upholding unrelated claims pertaining to money laundering).  To the extent Defendants' argument here has any merit, it only can dismiss whatever securities fraud racketeering activity is alleged in the Amended Complaint, which Plaintiffs respectfully submit does not exist.

at 369.  The *Fleetwood* court rejected this argument by applying the choice-of-law principles under the Restatement (Second) of Conflict of Laws § 187(2), which require a court to apply the choice of law provision unless: (a) "[t]he chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties' choice" or (b) "[a]pplication of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chose state in the termination of the particular issue[.]" *Fleetwood*, at 370 (quoting Restatement (Second) of Conflict of Laws § 187(2)).

In rejecting application of CBSG's Pennsylvania choice-of-law provision, the *Fleetwood* Court first recognized that there is "a 'true conflict' between Pennsylvania and Texas law concerning usury." *Id*. at 370.  This is axiomatic because "there [can] be no question a true conflict existed where the law of one jurisdiction has applicable usury law, and the other does not."  *Id*. (citations omitted).  Defendants Motion has made clear that Pennsylvania does not have usury laws applicable to this situation, but as set forth in the Amended Complaint, Florida—where CBSG actually operated—does.  *See* Fla. Stat. § 687.071 (making illegal interest rates above 25% on loans); ECF No. 38 ¶¶ 66, 72, 95, 108-114 (Amended Complaint's pleadings as to CBSG being a Florida entity).  Not only does CBSG's state of residence have usury laws, but the states where the representative class Plaintiffs reside, New Jersey, Massachusetts, New York, and California, do as well.  *See* N.J. Stat. § 2C:21-19; N.Y. Penal Law § 190.40; MA GOL, ch. 271, § 49; and CA Stats. 1919 p. lxxxiii, § 2 and Stats. 1919 p. lxxxiii § 3, and Article XV, § 1 of the California Constitution.

Having established a true conflict exists, the next step in the analysis, as *Fleetwood* outlines, is the "Court must determine whether, under Restatement § 188, the chosen state or another state's law would apply in the absence of the choice of law provision." *Fleetwood*, at 370. This analysis draws on several factors, including "(a) the place of contracting, (b) the place of

negotiation of the contract, (c) the place of performance, (d) the location of the subject matter of the contract, and (3) the domicile, residence, nationality, place of incorporation and place of business of the parties." _Fleetwood_, at 370-71 (quoting Restatement § 188). Applying these factors, the _Fleetwood_ Court held that the laws of Texas would apply, trumping CBSG's Pennsylvania choice of law provision. _Id._ 371-372. The _Fleetwood_ Court came to this conclusion because (i) the _Fleetwood_ plaintiffs were residents of Texas; (ii) the property used to secure the MCA agreement was located in Texas; and (iii) the solicitation and execution of the MCA agreement "substantially occurred within the state of Texas." _Id._ Finally, the _Fleetwood_ court found that "applying Pennsylvania law would violate a fundamental public policy of Texas, namely its 'antipathy' to high interest rates, regardless of the nature of the debtor." _Id._ at 372.[3]

There is even less reason to deviate from _Fleetwood_'s and similar case law conclusions here than there was in _Fleetwood_ because here the Amended Complaint goes further and alleges that CBSG is not actually a Pennsylvania entity but rather a Florida entity, which does have a strong public policy against usury. _Jersey Palm-Gross v. Paper_, 658 So. 2d 531, 535 (Fl. 1995) (Florida Supreme Court rejects contractual provision because "[i]f approved, we believe this practice would undermine public policy as set by the legislature and defeat the purpose of Florida's usury statute"). Specifically, the Amended Complaint alleges facts establishing CBSG is really a Florida entity, including: (1) CBSG filed documents with the Florida state government listing its

---

[3] Pennsylvania's highest court has rejected similar attempts by usurious lenders to avoid the strong public policies of Pennsylvania through a choice-of-law provision. _Cash America Net of Nevada, LLC v. PA Dept. of Banking_, 8 A.3d 282 (Pa. 2010) (holding that an out-of-state lender, that supplied loans to Pennsylvania residents over the internet, was subject to Pennsylvania law); _PA Dept. of Banking v. NCAS of Del., LLC_, 948 A.2d 752, 777 (Pa. 2008) ("Any interest that Delaware may have in permitting Cash Advance Centers to charge the Monthly Participation Fee is minimal, at best, and is outweighed by Pennsylvania's significant interest in protecting Commonwealth borrowers from exploitive lending practices").

office as located in Florida, ECF No. 38 ¶ 108; (2) Enterprise members testified that CBSG "does not have an office in Philadelphia, but rather has a 'Florida domicile,'" *Id*. ¶ 109; (3) Enterprise members further testified that CBSG only has offices in Florida; *Id*. ¶ 110; (4) the Enterprise paid no Philadelphia city tax, *Id*. ¶ 111; and (5) all business decisions were made in Florida, *Id*. Thus, under *Fleetwood*—which examined this same argument applied to the same choice of law provision—Florida law, not Pennsylvania law, should govern.

Even if this Court were to not apply Florida law, the *Fleetwood* analysis would compel this Court to apply the laws of the state of one of the named Plaintiffs, either New Jersey, Massachusetts, New York, and/or California. As alleged in the Amended Complaint, the MCAs included a UCC lien on all of the merchants' assets, *Id*. ¶ 69, which would weigh in favor of applying the law of the merchants' forum state. *Fleetwood*, at 370-72. Since CBSG did not actually have a physical location in Pennsylvania, the only forum other than Florida that has ties to the relevant transactions are that of the merchants, i.e., New York, New Jersey, Massachusetts and Florida, ECF No. 38 ¶¶ 28-39, which again weighs in favor of applying these states' laws over Pennsylvania under the *Fleetwood* analysis. *Fleetwood*, at 370-72.

Most importantly, like Florida, New York, New Jersey, Massachusetts and California all have strong public policy against usury. *Samson Lending LLC v. Greenfield Mgt. LLC*, 80 Misc. 3d 1023, 1031 (Sup. Ct. 2023) ("Multiple court decisions have determined that New York laws against usury constitute fundamental public policy"); *Ellison v. Evergreen Cemetery*, 266 N.J. Super. 74, 84 (Super. Ct. 1993) (recognizing New Jersey's "strong public policy against usury"); *In re Stone St. Capital, LLC*, 2013 Mass. Super. LEXIS 45, *6 (Super. Ct. May 10, 2013) ("The public policy against usury is clearly a matter for grave legislative concern"); *G Companies Management, LLC v. LREP Arizona, LLC*, 88 Cal. App. 5th 342, 347 (Ct. App. 4th Dist. 2023)

("since California's usury law reflects a significant public policy designed to protect its citizens, our law precludes enforcement of a forum selection clause that will deprive a California resident of that protection").  Indeed, these States' public policy against usury was reconfirmed by a joint complaint filed by the Attorneys General of New York, New Jersey, Massachusetts and California, among others, against the Office of the Comptroller of the Currency on grounds that a proposed rule would circumvent those States' strong public policies against usury.  *See* Heskin Decl. Ex. A.

New York, New Jersey, and California, where a majority of the Plaintiffs reside, have such strong policies against usury that courts in these States nullify choices of law provisions designed to circumvent those states usury laws.  *G Companies*, at 347 (California "law precludes enforcement of a forum selection clause that will deprive a California resident of that protection"); *Brack v. Omni Loan Co., Ltd.*, 164 Cal. App. 4th 1312, 1326 (Cal. Ct. App. 2008) (similar); *Samson Lending LLC v. Greenfield Mgt. LLC*, 80 Misc. 3d 1023, 1026 n. 10 (Sup. Ct. 2023) ("A number of cases have applied New York law—despite the parties' choice of another forum's law—because New York's usury prohibition constitutes a fundamental public policy") (collecting cases); *Madden v. Midland Funding, LLC*, 237 F.  Supp. 3d 130, 150 (S.D.N.Y. 2006) (similar); *Turner v. Aldens, Inc.*, 179 N.J. Super. 596 (Super. Ct. App. Div. 1981) (similar); *Saturn Funding, LLC v. NRO Boston, LLC*, 2017 Mass. Super. LEXIS 3, *6 (Mass. Super. Ct. 2017) (rejecting out-of-state choice of law provision and confession of judgment in MCA agreement) ("Here, the agreements were executed in Massachusetts, by Massachusetts residents and Massachusetts businesses, through a Massachusetts notary. While the agreements may satisfy the requirements for a judgment by confession under New York Civil Practice Law and Rules §3218, the plaintiff offers no explanation as to how these were not, for all intents and purposes, 'Massachusetts agreements.'").

Consistent with all these cases is the concern to prevent a lender from circumventing the usury laws of the state of the borrower or its own state by arbitrarily selecting a choice of law provision with a state that lacks usury laws, and that is exactly what the Amended Complaint alleges CBSG did here.  ECF No. 38 ¶¶ 69-72, 96, 114.  Given these facts and law, it would be inappropriate to dismiss the Amended Complaint merely because CBSG artificially chose a Pennsylvania choice of law provision so as to avoid the usury laws of its actual resident state Florida and the usury laws of its merchant victims like New York, New Jersey, Massachusetts and California.

*ii.*   ***The MCA Agreements are substantively usurious loans.***

Defendants also argue that the MCA Agreements are not substantively loans, but notably do so without indulging in any analysis of their own MCA Agreements; instead, they argue that the MCA Agreement cannot be a loan because the SEC Action has not taken that position.   ECF No. 44 at 12-14.  Notably, Defendants do not cite any decision from the SEC Action that ruled on the merits that CBSG's MCA Agreements are not loans, and that is because no such decision exists.  *Id.*  Nor could the SEC Action make that determination because it was not alleged in the SEC Complaint that Defendants attach to their own Motion.  *See generally* ECF No. 44-1.  Thus, when the SEC Action ordered that merchants continue to make payments to the CBSG receiver pursuant to the MCA Agreements, no argument was presented on behalf of any merchants that the MCA Agreement loans were unenforceable.  Indeed, merchants are not even a party to the SEC Action, which was brought on behalf of investors.  *Id.*  What is notable is that the SEC Complaint repeatedly refers to CBSG's MCA Agreements as "loans" and noted that they imposed interest rates in excess of 400%.  *Id.* ¶¶ 43-46.  So do the Grand Jury indictments, and Criminal

Information.  Thus, to the extent Defendants rely on the SEC Complaint, which it attaches in support of its Motion, that document only confirms that CBSG's MCA Agreements are loans.  *Id.*

Significantly, the SEC is not alone in describing CBSG's MCA Agreements as loans.  As set forth in the Amended Complaint the marketing materials that Defendants reviewed prior to agreeing to cooperate with the Enterprise all described the MCA Agreements as loans with annual interest rates of approximately 100%.  ECF No. 38 ¶¶ 15-21.  The Amended Complaint even attaches an email addressed to Josef form CBSG that readds "I have agreed with [Josef] to do a review of the Loans that CBSG has initiated from January 2015 to date."  *Id.* Ex. C.  CBSG also had merchants, such as Plaintiff Heller, execute mortgages as additional security for MCA Agreements where the mortgages explicitly referred to the MCA Agreements as loans.  *See* Heskin Decl. Ex. B.  The Department of Justice also described CBSG's MCA Agreements as "loans" in a criminal information against the Enterprise's enforcer, Gino Gioe ("Gino"), which was attached to the Amended Complaint.  ECF No. 38, Ex. H ¶ 9.

 Defendants' reluctance to even try to support the MCA Agreement is not a loan by reliance on the Agreement itself is telling because it bears all the hallmarks of loans courts, such as New York where Plaintiffs B&T and Odzer reside, consider when determining whether a transaction is truly a loan or a purchase of receivables.  Under recent Second Circuit authority, to determine whether MCA Agreements are really loans, courts should consider at least three factors: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy."  *Fleetwood Servs., LLC v. Richmond Capital Grp. LLC*, 2023 U.S. App. LEXIS 14241, *3 (2d Cir. June 8, 2023).*  Other non-exhaustive factors include: (4) whether the agreements identify particular revenue or accounts that were supposedly purchased; (5) whether the merchant is responsible for

collect the future receipts; and (6) whether default is declared after just a few missed payments. *LG Funding, LLC v. United Senior Properties of Olathe, LLC*, 181 A.D.3d 664, 666 (2d Dep't 2020); *Davis v. Richmond Capital Group*, 194 A.D.3d 516, 517 (1st Dep't 2021); *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237 (S.D.N.Y. 2022); *Lateral Recovery LLC v. Queen Funding LLC*, 2022 U.S. Dist. LEXIS 129032, *12-13 (S.D.N.Y. July 20, 2022); *Lateral Recovery, LLC v. Cap. Mech. Servs. LLC.*, 632 F. Supp. 3d 402 (S.D.N.Y. 2022); *see also Oakshire Props., LLC v. Argus Capital Funding, LLC*, 2024 N.Y. App. Div. LEXIS 4036 (4th Dep't July 26, 2024). Applying these factors to the MCA Agreement Defendants attached to their Motion, ECF No. 44-2, shows that the MCA Agreement is an absolutely repayable loan.

First, as shown by the MCA Agreement Defendants attached to their motion, CBSG's MCA Agreements did not have a reconciliation provision. *See generally id*. Instead, all B&T had the right was to request a future adjustment of the fixed daily remittance, but even this was illusory because it was left to CBSG's "sole discretion and judgment" as to whether to comply with the request. *Id*. § 7(d). Identical language in reconciliation provisions in MCA Agreements have been construed as making them loans. *Fleetwood*, at *4 (Second Circuit finding MCA Agreement to be a loan where "any adjustment to the daily amount was subject to Richmond's 'sole discretion'"); *Haymount*, at 248-49; *Crystal Springs Capital Inc. v. Big Thicket Coin, LLC*, 220 A.D.3d 745, 747 (2d Dep't 2023) (finding MCA agreements loans where lender was "under no obligation" to reconcile payment); *Oakshire Props*, 2024 N.Y. App. Div. LEXIS 4036 (same).

Second, CBSG's MCA Agreements provided recourse in the event B&T declared bankruptcy. Specifically, the personal guaranty executed by Odzer provided that "[i]n the event Purchaser must return any amount paid by Merchant Seller or any other guarantor of the Guaranteed Obligations because that person has become subject to a proceeding under the United

States Bankruptcy Code or any similar law, Guarantor's obligations under this Guaranty shall include that amount."  ECF No. 44-2 at 19.  Identical language in an MCA Agreement's personal guaranty has been found to render the deal a loan.  *See LG Funding*, at 666; *CMS*, at 456; *New Y-Capp*, *13 (S.D.N.Y. Sept. 30, 2022)* ("And other provisions 'worked to ensure while bankruptcy may no longer have been an express default under the revised standard form of MCA Agreement, the guarantor continued to be absolutely liable for repayment in the event of a bankruptcy filing").

Third, CBSG's MCA Agreements all had definite terms.  For the B&T MCA Agreement supplied by Defendants with their Motion, the term was prominently stated to be 80 days.  ECF No. 44-2 at 4.  Any ambiguity as to whether this term was flexible is dispelled by the MCA Agreement itself, which reads: "The Receivables Purchased Amount and any Additional Sums shall be delivered and/or paid in full by Merchant Seller to Purchaser during the Expected Term." *Id*. § 4(b).  With an 80-day term, this B&T MCA Agreement has a readily calculable annual interest rate of 133%, which is more than twice the amount allowed under the laws of New York, Florida, New Jersey, Massachusetts and California.  *See* ECF No. 38 ¶ 67 (listing these states' usury laws).

Fourth, CBSG's MCA Agreements made missing just four payments an event of default. *See* ECF No. 44-2 at 29.  Numerous courts have found similarly onerous default provisions based on just a few missed daily payment to render the MCA Agreement a loan.  *CMS*, at 458 (finding MCA Agreement like a loan where the "merchant has to pay a fixed amount on a daily basis.  If it fails to do so just three times, a default is declared"); *Davis*, at 517 (1st Dep't 2021) (finding MCA Agreements like a loan where there were "provisions making rejection of an automated debit on two or three occasions without prior notice an event of default"); *Queen Funding*, *18 (S.D.N.Y. July 20, 2022)* (same); *Haymount*, at 249 (S.D.N.Y. 2022) (similar); *People v. Richmond Capital*

*Group LLC*, 2023 NYLJ LEXIS 2487, \*7-8 (Sup. Ct. Sept. 20, 2023) (finding MCA agreements to be loans where default would occur after three missed payments).

Fifth, nowhere in CBSG's MCA Agreements does it identify any specific receivables being purchased. *See generally* ECF No. 44-2. This too further demonstrates that the MCA Agreements are loans. *Haymount*, at 249 ("Nor does any MCA agreement identify particular revenues or accounts that were supposedly purchased, so there is no transfer of 'risk of nonpayment by any specific customer.'") (citations omitted).

Sixth, despite CBSG purportedly purchasing B&T's receivables, B&T was responsible for collecting these "purchased" receivables and depositing them into a designated bank account from which CBSG would withdraw the fixed daily remittance. *See* ECF No. 44-2 § 4(a)(i). This too further renders the MCA Agreements loans. *Haymount*, at 249 (ruling MCA agreements like loans where "the MCA agreements leave merchants with the responsibility to collect revenues from all their accounts").

And this is just an analysis of the MCA Agreement Defendants attached to their Motion. Other MCA Agreements and Defendants conduct further support a finding they are loans. For instance, many MCA Agreements with Plaintiffs *admitted on their face* that CBSG had "seller recourse" to ensure absolute repayment. Heskin Decl. Exs. F, G and I at 1. Many specified a finite term of repayment. *Id*. Exs. F, H, and I. Others had bankruptcy an explicit event of default. *Id*. Exs. F, G and I § 3.1(c). These MCA Agreements also made reconciliation completely discretionary and therefore illusory. *See, e.g. id.* Ex. F at 2 ("CBSG **may**, upon Seller/Merchant's request, adjust the amount of any payment due under this Agreement at **CBSG's sole discretion** and as it deems appropriate in servicing this Agreement") (emphasis added).

In practice, CBSG would ensure absolute repayment through filing confessions of judgment and through taking a security interest on the merchants' homes. *Id*. Exs. B-D. For instance, even though TourMappers was a tourism company that experienced no sales during the COVID pandemic, CBSG still filed a confession of judgment against TourMappers in April 2020 right as the tourism industry was collapsing. *Id*. Ex. D. CBSG has also placed liens on merchant's personal homes to secure repayment, as was the case with Shah who still has a lien on his home today. ECF. No. 38 ¶¶ 131-33. This is because CBSG, as Defendants knew, always treated their MCAs as absolutely repayable loans, further demonstrated by the extortion tactics used to collect detailed in the Amended Complaint. ECF No. 38 ¶¶ 78-89. Thus, all of the factors courts weigh point to the MCAs being absolutely repayable loans.

**b.    Plaintiffs adequately pled their remaining racketeering activities.**

Defendants argue that (1) perjury does not qualify as a RICO action; (2) only continuing threats of obstruction of justice and extortion constitute racketeering activity; (3) the allegations of extortion are insufficient to sustain the Amended Complaint, as Plaintiffs cannot state a claim by properly alleging only one RICO predicate act. ECF. No. 44 at 18-19. As an initial matter, Defendants have not moved to dismiss Plaintiffs' racketeering activity premised on wire fraud. *Compare id.* with ECF No. 38 ¶¶ 71-77. As such, that racketeering activity remains as pled and Defendants' argument that extortion alone cannot create a predicate act is moot since it is coupled with at least wire fraud that remains in full effect even if this Motion was granted.

First, the very case law Defendants cite refutes the notion that all racketeering activity must be continuous to be actionable. As the Court in *Tenamee v. Schmukler*, cited by Defendants, held "the continuity standard must be met by factual assertions demonstrating **either** a 'close-ended' pattern of past criminal activities over an extended period of time, or an 'open ended' pattern of such past activities combined with a threat of continuation into the future." 438 F. Supp. 2d 438,

447-448 (S.D.N.Y. 2006) (emphasis added). Thus, Defendants cannot argue that only threats of continuing obstruction of justice or extortion are actionable as racketeering activities. Here, the Amended Complaint provides numerous detailed examples of the CBSG Enterprise engaging in multiple acts of both obstruction of justice and extortion over several years, thereby satisfying the closed-ended Enterprise standard.

Specifically, the Amended Complaint asserts, with supporting documents from DOJ indictments and criminal information, how the Enterprise would use threats of violence, in person and electronically, to extort payments from merchants on numerous occasions, including particular videographic evidence of an Enterprise enforcer entering the office of one of the Plaintiffs to extort payment. ECF No. 38 ¶¶ 78-89. The Criminal Information filed by the Department of Justice against the Enterprise's enforcer Gino, attached as Exhibit H to the Amended Complaint, lists at least four discrete instances where the Enterprise used extortive tactics to have their loans repaid. ECF No. 38-8 ¶¶ 9-16. As for obstruction of justice, the Amended Complaint also provides specific acts taken over a series of years by the Enterprise that was directly related to avoiding legal scrutiny into the Enterprises unlawful collection of debt. For instance, the Enterprise (1) lied about its place of business to obstruct the collection of taxes; (2) used aliases to hide LaForte's involvement in the Enterprise as he was a convicted felon; (3) gave false testimony in depositions concerning the Enterprise's collection of debt. ECF No. 38 ¶¶ 90-114. Additional specific allegations of the Enterprise's obstruction over several years are reflected in Exhibit K to the Amended Complaint, which is an indictment against LaForte and other Enterprise members accusing them of multiple counts of extortion *and* obstruction of justice. *See generally* ECF No. 38-11. Many of the allegations therein were included in the text of the Amended Complaint itself, ECF No. 38 ¶¶ 101-111, and there is no basis to claim that Plaintiffs have not sufficiently alleged

close-ended racketeering activity of obstruction of justice and extortion merely because many of the Enterprise members are now in jail.

At bottom, Defendants' attacks on the alleged racketeering activity relating to obstruction of justice and extortion fall flat because Defendants deliberately ignore the entire body of RICO case law allowing predicate acts to be established with close-ended continuity. *Watral v. Silvernails*, 177 F. Supp. 2d 141, 148 (E.D.N.Y. 2001) ("The element of continuity may be satisfied by showing either 'closed ended continuity' or 'open-ended continuity'") (citing *H.J. Inc. v. Northwester Bell Tel. Co.*, 492 U.S. 229, 239 (1989)).

Alternatively, Plaintiffs' non-unlawful collect of debt allegations survive because it has adequately pled collection of unlawful debt and because Defendants have not challenged wire fraud predicate acts. Where "Plaintiffs have sufficiently pleaded there is a valid predicate RICO violation in the collection of unlawful debt . . . the Court need not determine whether the additional wire fraud predicate acts have been adequately pleaded." *CMS* at 463 (rejecting defendants' arguments that wire fraud claims, similar to those alleged here, were inadequately pled); *see also*, *Angermeir v. Cohen*, 14 F. Supp. 3d 134, *153-154 (S.D.N.Y. 2014) (noting that once plaintiff adequately allege one set of predicate acts, the court need not address the adequacy of separate theories of predicate acts to sustain the RICO claim; *Mezzonen, S.A. v. Wright*, 1999 U.S. Dist. LEXIS 17625, *9 (S.D.N.Y. Nov. 16, 2019) (similar); *Serin v. Northern Leasing Sys.*, 2009 U.S. Dist. LEXIS 130899, *9 (S.D.N.Y. Dec. 15, 2009) (similar).

Here, as detailed above, Plaintiffs have pled multiple acts of collection of unlawful debt in the Amended Complaint, ECF No. 38 ¶¶ 65-77, 116-176, which only requires one predicate act to satisfy RICO's continuity element. *United States v. Grote*, 961 F.3d 105, 119 (2d Cir. 2020) ("RICO offenses may be predicated on a single instance of collection of unlawful debt, as well as

a pattern of racketeering activity").  Plaintiffs have also alleged predicate acts of wire fraud that Defendants failed to challenge with this Motion.  *Compare* ECF. No. 38 ¶¶ 71-77 *with* ECF. No. 44.  Thus, Plaintiffs have adequately alleged two predicate acts to support their RICO claims such that even if there were defects in the other predicate act allegations, they are not to be dismissed under New York law.  *Angermeir*, 14 F. Supp. 3d at 153 ("Defendants next argue the Complaint fails to allege predicate acts of extortion because 'the commencement of even meritless litigation does not amount to extortion under federal or state law.  The Court need not address this argument at this time, however, because even if Defendants were correct, Plaintiffs' independent allegations of mail and wire fraud—which Defendants do not directly challenge in their Motion—are enough to satisfy Plaintiffs' burden to plead predicate acts").

## CONCLUSION

For the reasons above, Defendants to meet their burden to dismiss Plaintiffs' well-pled Amended Complaint and their Motion should be denied in its entirety.

Respectfully submitted,

**WHITE AND WILLIAMS LLP**

By:  _____

Shane R. Heskin
Alex D. Corey
810 Seventh Avenue, Suite 500
New York, NY 10019
heskins@whiteandwilliams.com
coreya@whiteandwilliams.com

**ALMEIDA LAW GROUP LLC**
David S. Almeida, Esq.
849 W. Webster Avenue
Chicago, Illinois 60614.
david@almeidalawgroup.com

*Counsel for Plaintiffs*