UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 12/20/2024

-------------------------------------------------------------X

B AND T SUPPLIES, INC., d/b/a B AND
T SUPPLY d/b/a BIGGESTBOOK.COM,
*et al., individually and on behalf of those
similarly situated,*

                Plaintiffs,

    -v-

GEMJ CHEHEBAR GRAT, LLC, JOSEF
CHEHEBAR, and ISAAC SHEHEBAR,

             Defendants.

-------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

23-CV-11241 (GHW) (HJR)

**HENRY J. RICARDO, United States Magistrate Judge.**

**To the Honorable Gregory H. Woods, United States District Judge:**

Plaintiffs are small businesses and business owners who entered into

"merchant cash advance agreements" ("MCA Agreements"), a type of financing

contract, with a company named Complete Business Solutions Group, Inc.

("CBSG").  While the MCA Agreements describe these financings as sales of

receivables, Plaintiffs allege that the MCA Agreements were actually disguised

loans that were unlawfully usurious.  Through this action, Plaintiffs allege that

defendants GemJ Chehebar Grat, LLC, Josef Chehebar, and Isaac Shehebar

(collectively the "Chehebars" or "Defendants") conspired with CBSG and its

principals to collect the unlawful debts evidenced by the MCA Agreements in

violation of the Racketeer Influenced and Corrupt Organization Act ("RICO").  The

1

Amended Class Action Complaint (hereafter, the "Amended Complaint"), ECF No. 38, asserts a single cause of action for violation of 18 U.S.C. § 1962(d).

Defendants seek dismissal of the Amended Complaint on various grounds, including the statute of limitations, Section 107 of the Private Securities Litigation Reform Act, 18 U.S.C. § 1964(c), failure to plead plausible RICO predicate acts, res judicata and the *Rooker-Feldman* doctrine. For the reasons described below, Defendants' motion should be **DENIED**.

## I.    FACTS

CBSG is a corporation that provided financing to small businesses in the form of MCA Agreements. Amended Complaint ("Am. Compl."), Dkt. No. 38, ¶ 50.[1] Although the MCA Agreements are styled as "merchant cash advances," Plaintiffs allege that they are disguised loans with illegally high rates of interest. Am. Compl. ¶¶ 3–5, 50. Plaintiffs are businesses and business owners that entered into MCA Agreements and were required to pay allegedly illegal amounts of interest. Am. Compl. ¶¶ 1, 115–176.

Defendants in this case are alleged "insider investors" in CBSG who provided it tens of millions of dollars in funding in exchange for a share of the proceeds from the MCA Agreements and CBSG's profits. Am. Compl. ¶¶ 9–11. Plaintiffs allege that the Chehebars, CBSG, and others operated a RICO enterprise to make and collect on the usurious MCA Agreements, and that they committed wire fraud,

---

[1] The well-pleaded facts of the Amended Complaint are accepted as true for purpose of this motion.

extortion, perjury, obstruction of justice, witness tampering, and witness retaliation in furtherance of this enterprise. *Id.* ¶ 48.

While CBSG is not a party here, it is the subject an action filed by the Securities and Exchange Commission (the "SEC") on July 24, 2020, in the United States District Court for the Southern District of Florida (hereafter, the "Receivership Action"). The SEC alleges that CBSG engaged in a scheme to defraud investors out of hundreds of millions of dollars. *See SEC v. Complete Business Solutions Group, Inc., d/b/a Par Funding, et al.*, No. 20-CV-81205-RAR (S.D. Fla.) (hereafter, "Fl. Dkt.") Dkt. No. 1. The Honorable Rodolfo A. Ruiz, II is the District Judge presiding over the Receivership Action. On July 27, 2020, that court appointed Ryan K. Stumphauzer as the Receiver for CBSG and its family of corporate entities. Fl. Dkt. No. 36. The Florida court stayed all other litigation involving CBSG and related entities and individuals. Fl. Dkt. No. 56.

On April 22, 2024, the Receiver filed a status report advising that he would seek court approval for a proposed claims determination. Fl. Dkt. No. 1840. The SEC argued that in order to approve the proposed claims determination, the court would need to determine that CBSG operated as a Ponzi scheme. Fl. Dkt. No. 1841. Interested parties were given a two-week period in which to file objections to the Receiver's plan. Fl. Dkt. No. 1845.

Among those filing objections were several merchants that had entered into MCA Agreements with CBSG. Before the receivership, some of these merchants had sued CBSG on the theory that the MCA Agreements were illegal loans. Fl. Dkt.

No. 1887 at 1–2.  Several of these same merchants are plaintiffs in this litigation: TourMappers North America, LLC, Julie Katz, MH Marketing Solutions Group, Inc., and Michael Heller.  *Id.* at 1.  The same counsel represents these merchants in Receivership Action and in this case.  *Id.*

In their Receivership Action filings, this group of merchants made many of the same argument that they present here, *i.e.*, that the MCA Agreements were disguised loans for which CBSG charged usurious interest.  *Id.*  In response, the Receiver argued that the MCA Agreements were not loans or, in the alternative, that the loans were legal under Pennsylvania law, which governed.  Fl. Dkt. No. 1929.  The Chehebars filed objections to the Receiver's plan in Florida, arguing that CBSG was not a Ponzi scheme, that their liens gave them priority in the claims process, and that the Receiver was unfairly treating them as "insiders" as opposed to victims of fraud.  Fl. Dkt. No. 1890.

On June 26, 2024, Judge Ruiz issued a 43-page order overruling these objections and finding in favor of the Receiver.  Fl. Dkt. No. 1976.  Currently, the Receiver's final distribution plan is pending before the Florida court.  Fl. Dkt. No. 2014.  Plaintiffs report that the merchant-intervenors have reached a settlement in principle with the Receiver and their appeal from the claims determination will be withdrawn.  Dkt. No. 53.

## II.    PROCEDURAL HISTORY

Plaintiffs filed this case on December 28, 2023, on behalf of themselves and putative class members.  Dkt. No. 1.  On January 2, 2024, the case was referred to Magistrate Judge Barbara Moses for any dispositive motions.  Dkt. No. 3.  On June

10, 2024, the defendants moved to dismiss the complaint.  Dkt. No. 28.  On June 26, 2024, Plaintiffs voluntarily dismissed their claims against defendants Eckert Seamans Cherin & Mellot, LLC and John J. Pauciulo under Rule 41(a)(1)(A)(i).  Dkt. No. 33.

Plaintiffs filed an Amended Complaint ("Am. Compl.") on June 28, 2024.  Dkt. No. 38.  The Court subsequently denied the defendants' pending motion to dismiss as moot.  Dkt. No. 40.  On July 7, 2024, the Plaintiffs dismissed every defendant other than GemJ Chehebar Grat, LLC, Josef Chehebar, and Isaac Shehebar.  Dkt. No. 41.

On July 17, 2024, Defendants moved to dismiss the Amended Complaint.  Dkt. No. 43.  In support, they filed a memorandum of law ("Def. Mem."), Dkt. No. 44, the Amended Complaint filed by the SEC in the Receivership Action, Dkt. No. 44-1, and a copy of an MCA Agreement between Plaintiff B & T Supplies and CBSG.  Dkt. No. 44-2.

Plaintiffs filed their memorandum of law in opposition ("Pl. Mem.") on August 2, 2024.  Dkt. No. 46.  They also filed the Declaration of Shane R. Heskin dated August 2, 2024, and supporting exhibits.  Dkt. No. 45.

Defendants filed their reply papers ("Def. Reply") on August 9, 2024.  Dkt. No. 47.  On August 29, 2024, this case was reassigned to me.  On September 16, 2024, Plaintiffs submitted a "Letter Supplementing the Record" providing copies of recent guilty pleas entered by members of the alleged CBSG enterprise.  Dkt. No. 48.  Defendants asked to strike this submission by letter motion, which Judge

Woods denied without reaching the issue of whether it was proper for the Court to consider the guilty pleas.[2]  Dkt. Nos. 49, 50.  On October 30, 2024, Plaintiffs filed a letter reporting a settlement in principle with the Receiver in the Receivership Action.  Dkt. No. 53.

## III.  APPLICABLE LAW

### A.    Motion to Dismiss Under Rule 12(b)(6)

Most of Defendants' grounds for dismissal – that Plaintiffs' claims are untimely, that the PSLRA bars them, that Plaintiffs fail to plead RICO predicate acts, and that Plaintiffs' claims are barred by res judicata – are governed by Federal Rule of Civil Procedure 12(b)(6), which allows for dismissal for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

In considering a Rule 12(b)(6) motion, a court accepts all well-pleaded allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor.  *See, e.g., Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec. LLC,* 568 F.3d 374, 381 (2d Cir. 2009).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal,* 556 U.S. 662, 678, (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (citation omitted).  Mere "labels and conclusions" or a "formulaic

---

[2] These guilty pleas play no part in this Report and Recommendation.

recitation of the elements of a cause of action" are not enough to survive a motion to dismiss. *Twombly,* 550 U.S. at 555.

**B.      Motion to Dismiss Under Rule 12(b)(1)**

In additional to their 12(b)(6) arguments, Defendants also argue that the case should be dismissed based on the *Rooker-Feldman* doctrine.  Because federal courts lack jurisdiction in cases where the *Rooker-Feldman* doctrine applies, this argument is properly considered under the Rule 12(b)(1) standard.  *Hylton v. J.P. Morgan Chase Bank*, *N.A.*, 338 F. Supp. 3d 263, 273 (S.D.N.Y. 2018).

"Rule 12(b)(1) requires dismissal of an action when the district court lacks the statutory or constitutional power to adjudicate it." *Williams v. Novoa*, 19-cv-11545 (PMH), 2021 WL 431445, at *3 (S.D.N.Y. 2021) (internal quotation omitted) (quoting *Schwartz v. Hitrons Sols., Inc.*, 397 F. Supp. 3d 357, 364 (S.D.N.Y. 2019)).  "The party invoking the Court's jurisdiction bears the burden of establishing jurisdiction exists." *Id.* (quoting *Hettler v. Entergy Enters., Inc.*, 15 F. Supp. 3d 447, 450 (S.D.N.Y. 2014)).

"When deciding a motion to dismiss under Rule 12(b)(1) at the pleadings stage, the Court must accept as true all material facts alleged in the complaint and draw all reasonable inferences in the plaintiff's favor." *Williams*, 2021 WL 431445, at *3 (internal quotation omitted) (quoting *Hettler*, 15 F. Supp. 3d at 450).  In addition, the court "may consider affidavits and other material beyond the pleading to resolve jurisdictional questions." *Kraiem v. JonesTrading Institutional Servs. LLC*, 2020 WL 5819557, at *4 (S.D.N.Y. Sept. 30, 2020) (citing *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008)).

### C.    Civil RICO

To survive a motion to dismiss a civil RICO action, the plaintiffs must allege

(1) conduct (2) of an enterprise (3) through a pattern of (4) racketeering activity.

*Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985); *DeFalco v. Bernas,* 244

F.3d 286, 306 (2d Cir. 2001).

## IV.    ANALYSIS

### A.    Statute of Limitations

Plaintiffs' only cause of action is for violation of the RICO statute, 18 U.S.C.

§ 1962(d).  Civil RICO claims are subject to a four-year limitations period.  *Agency*

*Holding Corp. v. Malley–Duff & Assocs.,* 483 U.S. 143, 156 (1987).  The statute of

limitations begins to run when the plaintiff discovers or should have discovered the

RICO injury.  *Bankers Trust v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir. 1988).

Plaintiffs commenced litigation on December 28, 2023, which means that any claims

that Plaintiffs discovered or should have discovered by December 28, 2019 are

untimely.  *See* Dkt. No. 1.

Although the statute of limitations is an affirmative defense, "a defendant

may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense

appears on the face of the complaint."  *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547

F.3d 406, 425 (2d Cir. 2008).  Defendants argue that the Amended Complaint itself

demonstrates that Plaintiffs' claims are time-barred because it expressly alleges

that most of the named Plaintiffs entered into MCA Agreements before December

28, 2019.  Def. Mem. at 5; Am. Compl. ¶¶ 118–21, 135, 146–51.  This assertion is

accurate for the following Plaintiffs:  B and T Supplies, Inc., Tzvi Odzer, RKDK,

Inc., Gelato on Hudson LLC, Daniel Shah, Asia Star Broadcasting, MH Marketing Solutions Group, Inc. and Michael Heller.[3]  Plaintiffs never dispute these factual assertions about when they entered into or guaranteed MCA Agreements, which are made at page 5 of Defendants' opening brief.

The Amended Complaint is not as clear about when the following Plaintiffs first entered into MCA Agreements:  TourMappers North America LLC, Julie Katz, Perfect Impression, Inc. and Susan Abrahams.  As Defendants point out, the Amended Complaint does not expressly allege that TourMappers North America LLC and Julie Katz ever entered into or guaranteed MCA Agreements at all (Def. Mem. at 5 n.2), although these Plaintiffs do purport to represent a class of plaintiffs who entered into such agreements on or after August 13, 2016.  Am. Compl. ¶¶ 185-86.  Plaintiffs Perfect Impression, Inc. and Susan Abrahams allege that they entered into and guaranteed, respectively, an MCA Agreement on February 20, 2020, that refinanced earlier MCA Agreements.  Am. Compl. ¶¶ 169–170.  Elsewhere, Paragraph 174 of the Amended Complaint alleges that this February 20, 2020 MCA Agreement was "the only loan it entered into with CBSG in 2020." While these allegations suggest that Perfect Impressions and Susan Abrahams entered into or guaranteed at least one MCA Agreement before December 28, 2019, the time when this occurred does not appear on the face of the Amended Complaint.

---

[3] More specifically, the Amended Complaint alleges a 2015 MCA Agreement by B and T Supplies, Inc. with payments by Tzvi Odzer (¶¶ 135-36), a 2014 MCA Agreement by RKDK, Inc. and Gelato on Hudson LLC guaranteed by Daniel Shah (¶ 119), a 2017 MCA Agreement by Asia Star Broadcasting (¶ 129), and a 2018 MCA Agreement by MH Marketing Solutions Group, Inc. guaranteed by Michael Heller (¶¶ 146, 149).

Because Plaintiffs allege harm from being subjected to usurious MCA Agreements, Defendants say that Plaintiffs discovered or should have discovered their alleged RICO injuries as soon as they entered into their respective MCA Agreements.  Def. Mem. at 5.  Indeed, Plaintiffs allege that their injuries "consist of improperly collected loan payments," suggesting that Plaintiffs should have discovered their injuries upon making their first payments soon after entering into MCA Agreements.  Am. Compl. ¶ 43.  Plaintiffs' opposition brief does not expressly dispute Defendants' assertion that mere entry into MCA Agreements or agreements to guarantee payment under MCA Agreements caused them RICO injury,[4] but raises two arguments in response.  First, Plaintiffs contend that each payment made during the life of an MCA Agreement constitutes a new injury, triggering a fresh four-year limitations period.  Pl. Mem. at 7–8.  Second, Plaintiffs assert that an injunction issued in the Receivership Action prevented them from bringing these claims and tolled the statute of limitations while the injunction was effective.  Pl. Mem. at 8.  These arguments are addressed in turn.

### 1.    Subsequent Loan Payments Do Not Trigger a New Limitations Period

While Plaintiffs are correct that subsequent injuries can trigger a new limitations period in a civil RICO case, the Second Circuit established that this occurs only when the subsequent injuries are "new and independent."  *In re Merrill*

---

[4] At oral argument, Plaintiffs advanced for the first time a theory that, depending on which state's law applies, the claims of some plaintiffs would not accrue until their payments under the MCA Agreements exceeded the amount they received.  Argument Tr. at 42-44.  Because this argument was not briefed or developed in any significant way, it is not considered on this motion.

*Lynch Ltd. P'ship Litig.* 154 F.3d 56, 59 (2d Cir. 1998).  That case involved claims by investors that partnerships marketed and run by Merrill Lynch were fraudulent from the outset.  *Id.* at 4.  Although the plaintiffs had made their investments more than four years before filing suit, they argued that later communications and collections of fees within four years of filing suit constituted new injuries triggering new limitations periods.  *Id.*  The Second Circuit rejected that argument, writing that "[c]ollection in later years cannot be viewed as a separate and distinct fraud creating new injuries as it was simply a part of the alleged scheme."  *Id.*  Thus, *Merrill Lynch* appears to preclude Plaintiffs' first argument for why their claims are timely.  *See In re Trilegiant Corp.*, 11 F. Supp. 3d 82, 104-06 (D. Conn. 2014) (applying *Merrill Lynch* to conclude that RICO injury occurred upon enrollment into membership program scheme).

Plaintiffs do not address or attempt to distinguish *Merrill Lynch* in their opposition brief.  Instead, they rely on a more recent decision from this District said to stand for the proposition that RICO claims are timely as long as the complaint alleges any overt act injuring the plaintiff within the preceding four years.  Pl. Mem. at 7 (citing *Lateral Recovery, LLC v. Cap. Merch Servs., LLC*, 632 F. Supp. 3d 402, 450 (S.D.N.Y. 2022)).  Plaintiffs contend that their claims are timely because they allege that they continued making payments under the MCA Agreements after December 28, 2019.  Pl. Mem. at 8.  While the *Lateral Recovery* decision addressed similar merchant cash advance contracts, Plaintiffs' reliance on *Lateral Recovery* is misplaced.  In that case, the court addressed whether groups of civil RICO claims,

which accrued in favor of three merchants before they were assigned to the plaintiffs, arose within four years of the complaint.  In concluding that these RICO claims were timely, the court focused on the fact that, for each category of form contracts that was before the court, there was at least one contract "that was entered into" after the date four years prior to the filing of the complaint.  *Lateral Recovery*, 632 F. Supp. 3d. at 450, n.22 ("And because there is one of each relevant form of agreement that was entered into after this date [the four-year statute of limitations cut-off], the Court need not consider at this juncture whether an earlier accrual date for statute of limitations purposes would be appropriate either under the discovery rule or by relating back the filing of the initial complaint in this action to the commencement of the arbitration-related suit.").  Because it relied on when the contracts in question were *entered into*, *Lateral Recovery* does not support Plaintiffs' contention that payments made *after entry* into allegedly usurious agreements restart the statute of limitations.  Indeed, the plaintiffs in *Lateral Recovery*, which were represented by the same counsel representing Plaintiffs here, advanced no such argument.[5]  Accordingly, the holding of *Lateral Recovery* does not support the proposition for which Plaintiffs cite it.

At oral argument, Plaintiffs suggested for the first time that, notwithstanding *Merrill Lynch's* requirement of "new and independent" injuries to

---

[5] Instead, the plaintiffs in *Lateral Recovery* argued that their assigned claims related back earlier filings, including to an arbitration.  *In re Lateral Recovery*, No. 1:21-cv-9336-LJL, Dkt. No. 31, at *32–35.

12

restart the statute of limitations, this rule does not apply in civil RICO actions for collection of unlawful debt.  Argument Tr. at 38:17–39:6.  In support of this assertion, Plaintiffs cite *LG Cap. Funding, LLC v. ExeLED Holdings Inc.*, No. 17-CV-4006 (LJL), 2024 WL 1116082, at *8 (S.D.N.Y. Mar. 13, 2024).  *See* Argument Tr. at 39:7–22.  But *LG Capital Funding* does not support this proposition.  In that case, the counter-claim defendants argued that civil RICO claims were time barred, *even assuming* that the limitations period began to run at the last instance of collection of unlawful debt.  Critically, the parties did not dispute this assumption.  Thus, *LG Capital Funding* focused on whether the civil RICO claims related back to the initial complaint, and did not decide whether the claims accrued when the allegedly unlawful contacts were entered or at some later date when the debt was collected.  *Id.*  The *LG Capital Funding* court had no occasion to consider whether *Merryl Lynch* is somehow inapplicable to civil RICO actions for collection of unlawful debt.

In the end, Plaintiffs cite no authority to avoid the rule articulated in *Merrill Lynch*.  Accordingly, because the Amended Complaint alleges RICO injury that was discovered or should have been discovered more than four years before the original complaint was filed for all Plaintiffs other than TourMappers North America LLC, Julie Katz, Perfect Impression, Inc. and Susan Abrahams, and because Plaintiffs fail to allege any "new and independent" injury within four years of the complaint, the claims of the following Plaintiffs are time-barred absent some basis to toll the statute of limitations:  B and T Supplies, Inc., Tzvi Odzer, RKDK, Inc., Gelato on

Hudson LLC,  Daniel Shah, Asia Star Broadcasting, MH Marketing Solutions Group, Inc. and Michael Heller.  While the Court suspects that the claims of the other four Plaintiffs also accrued more than four years before the original complaint was filed, the facts needed to make that determination do not appear on the face of the Amended Complaint.

### 2.    Plaintiffs Plausibly Allege That Their Claims Were Tolled by Order of the Receivership Action

Plaintiffs advance a second argument for why their claims are timely:  they were barred from suing by an order entered in the Receivership Action and the statute of limitations was tolled while this order was in effect.  Def. Mem. at 8.

The relevant portion of the receivership order is set forth below:

[T]he following proceedings are stayed until further Order of this Court:

All civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or other actions of any nature involving: (a) the Receiver, in his capacity as Receiver; (b) any Receivership Property, wherever located; (c) any of the Receivership Entities, including subsidiaries and partnerships; or, (d) any of the Receivership Entities' past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise (such proceedings are hereinafter referred to as "Ancillary Proceedings").

Dkt. No. 141 at 12.[6]  In response, Defendants do not dispute that this order tolled the statute of limitation for claims falling within it.  Instead, Defendants argue

---

[6] Although this Receivership Action filing was not attached to the Amended Complaint, a court may take judicial notice of "a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413

that this order does not apply to claims against the Chehebars because they are not "Receivership Entities."  Def. Reply at 4.

At oral argument, Plaintiffs focused on the portion of subsection (d) barring litigation against CBSG's "agents," claiming it applies to the Chehebars because they served as consultants to CBSG and were thus "agents" of CBSG, which is a Receivership Entity.  Argument Tr. at 32-33; *see also* Am. Compl. ¶ 58 (alleging that the Chehebars had consulting agreements with CBSG).  In response, Defendants pointed to Section 5 of a February 2017 consulting agreement in which the consultant acknowledges that it is an independent contractor "and is not an agent" of CBSG.  *See* Argument Tr. at 58 (referring to Ex. 8, ECF No. 38-4 at 24.) But this agreement is not a "consulting agreement with the Chehebars," as Defendants suggested; it is a contract with Lindsay Blake Inc., which is not a defendant in this case.  The same exhibit also contains two other consulting agreements:  (1) a January 10, 2017 Consulting Agreement between CBSG and GemJ Chehebar Grat, LLC, which is a Defendant in this case, and (2) a January 10, 2017 Consulting Agreement between CBSG and Isaac Shehebar, who is also a Defendant in this case.  Unlike the agreement with Lindsay Blake Inc., which expressly disclaims an agency relationship, the consulting agreements with the two

---

F.3d 257, 261 (2d Cir. 2005).  "[M]atters of which the court takes judicial notice are not considered matters outside the pleadings; the Court may consider them when adjudicating a motion to dismiss without converting the motion to dismiss into a motion for summary judgment."  *Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 75 (S.D.N.Y. 2015).  The filings in the Receivership Action are on the public docket, and "[C]ourts in this District routinely take judicial notice, on a motion to dismiss, of public filings like this, including filings made on court dockets."  *Press v. Primavera*, 685 F. Supp. 3d 216, 224 (S.D.N.Y. 2023).

Defendants contain narrower disclaimers:  they provide that the consultant is not an "affiliate" or "employee" of CBSG (ECF No. 38-4 at 2, 11), but they do not expressly state that the consultant is not an "agent" of CBSG.  Given the absence of a specific disclaimer of an agency relationship with Defendants, language that CBSG was plainly capable of including in its consulting agreements, the agreements cited in Exhibit 8 do not negate an agency relationship between Defendants and CBSG.

While Defendants might ultimately demonstrate that they are not "agents" of CBSG within the meaning of the stay order entered in the Receivership Action, the Court cannot make this determination from the face of the Amended Complaint and other materials that can be considered on this Rule 12 motion.  At oral argument, Defendants asserted that Plaintiffs have made contrary representations about whether the stay applied to their claims.  Argument Tr. at 58-59.  Ruling in Defendants' favor on this point would require considering materials that are not before the Court on this motion.

At the motion to dismiss stage, the Court must draw all reasonable inferences in Plaintiffs' favor. *Pension Comm. of Univ. of Montreal Pension Plan*, 568 F.3d at 381 (2d Cir. 2009).  While evidence admissible at a later stage might prove otherwise, reading the order from the Receivership Action in the light most favorable to Plaintiffs, it is at least plausible that Plaintiffs were barred from filing this case until the stay was lifted.  It is plausible to infer that the Chehebars, for the reasons alleged in the Amended Complaint, were "agents" of CBSG.  For these

16

reasons, Plaintiffs' claims should not be dismissed on statute of limitations grounds at this stage of the litigation.

### B.    The PSLRA Does Not Bar Plaintiffs' Claims

Section 107 of the Private Securities Litigation Reform Act ("PSLRA"), 18 U.S.C. § 1964(c), provides that "no person may rely upon any conduct that would have been actionable as fraud in the purchase or sale of securities to establish a violation of section 1962." Defendants argue that this section, referred to as the "RICO Amendment," bars Plaintiffs' sole cause of action under Section 1962(d). Def. Mem. at 7–11. Citing Plaintiffs' allegations that Defendants assisted CBSG in establishing contact with defrauded investors and that investor proceeds were used to fund the MCA Agreements, and citing the SEC's allegations that CBSG made false representations to investors concerning its underlying business of entering into MCA Agreements, Defendants argue that the RICO Amendment bars Plaintiffs' claims because all the alleged predicate acts were taken in furtherance of the investment fraud scheme. *Id.* In other words, "[p]laintiffs' civil RICO claims are based on the same alleged scheme which is at the heart of the SEC Action." *Id.* at 10.

The RICO Amendment bars a civil RICO claim "only when the alleged fraud is in the actual purchase or sale of securities, not when securities are incidental to the fraud." *D'Addario v. D'Addario*, 75 F.4th 86, 94 (2d Cir. 2023). Moreover, "[t]he RICO Amendment also must not be construed so broadly as to bar RICO claims based on common law frauds that happen to involve securities." *Id.* at 93. In this case, Plaintiffs allege the following RICO predicate acts:

- Collection of unlawful debt, Am. Compl. ¶¶ 65–70;

- Wire fraud via labelling the MCA Agreements as merchant cash advances when they were actually loans, Am. Compl. ¶¶ 71–77;

- Extortionate collection on an extension of credit, Am. Compl. ¶¶ 78–89;

- Obstruction of justice to enable continued collection of unlawful debt, Am. Compl. ¶¶ 90–114.

None of these predicate acts involve the purchase or sale of securities. Indeed, when the SEC charged the CBSG enterprise with defrauding investors and illegally selling securities, it did not describe any of the RICO predicate acts alleged here. SEC Compl. ¶¶ 268–289.

Defendants argue that Plaintiffs' characterization of their claims is not controlling, and that the RICO Amendment bars claims based on "conduct undertaken to keep a securities fraud Ponzi scheme alive." Def. Reply at 5. Here, Defendants contend that the collection of unlawful debt was conduct undertaken to maintain CBSG's securities Ponzi scheme and that the unlawful debt collection and securities fraud were all part of the same corrupt enterprise. Def. Mem. at 8–9 (quoting *MLSMK Inv. Co. v. JP Morgan Chase & Co.* 651 F.3d 268, 277, n.11 (2d Cir. 2011)). However, the language that Defendants cite comes from a line of decisions addressing RICO claims by plaintiffs who had suffered investment-related losses, which distinguishes these cases from the facts alleged here.

The original source of the language that Defendants quote is the Third Circuit's decision in *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321,

324 (3d Cir. 1999).  In that case, plaintiffs "sought to recover approximately $70 million that they lost as a result of a Ponzi scheme" by suing "the intermediary which processed the securities trades."  In dismissing these claims under the PSLRA RICO Amendment, the Third Circuit found that the RICO predicate acts that plaintiffs alleged were committed to "induce[] new investments" directed at the objects of the scheme.  *Id.* at 330.  In other words, the predicate acts had a direct connection to the purchase or sale of securities.  The connection between the predicate acts alleged here and the purchase or sale of securities is far more attenuated.

The Second Circuit later quoted *Bald Eagle's* reference to "conduct undertaken to keep a securities fraud Ponzi scheme alive" in *MLSMK*.  651 F.3d at 277, n.11.  In that case, a victim of Bernie Madoff's Ponzi scheme sued Madoff's bank, alleging it had conspired with Madoff in his criminal enterprise.  *Id.* at 271. Once again, the basis for plaintiff's claim was that it had been defrauded *as an investor*.  Defendants argue that *MLSMK* also stands for the proposition that Section 107 bars civil RICO claims alleging predicate acts of securities fraud "even where a plaintiff cannot itself pursue a securities fraud action against the defendant."  Def. Mem. at 9 (*quoting MLSMK*, 615 F.3d at 277).  But the context of that statement was that the plaintiff alleged conduct amounting to aiding and abetting securities fraud, a claim for which there is no private right of action.  *See MLSMK* at 274.  Defendants' problem here is that Plaintiffs' claims are not predicated on securities fraud in the first place.

Finally, in a third case cited by Defendants, *Stevenson v. Thornburgh*, investors brought a civil RICO claim against the company in which they had invested, with their sole harm being the decline in the value of the shares they held. No. 23-cv-4458 (CM), 2024 WL 645187, at *1 (S.D.N.Y. Feb. 14, 2024).  These claims, too, were grounded in investor losses.[7]

Defendants' interpretation of the RICO Amendment is overly broad and would apply language from decisions addressing claims for *investor losses* to Plaintiffs' claims here, which do not rest on investor losses.  At bottom, Plaintiffs allege that they were victims of unlawful lending and collection practices.  Even assuming that there was a symbiotic relationship between CBSG's loan business and its fraudulent investment scheme, Plaintiffs' claims do not fall within the RICO Amendment because they do not rely on conduct that would have been actionable – by someone – as fraud in the purchase or sale of securities.  Thus, this case is not an attempt to "boot-strap" a securities fraud case into a RICO case.  *See MLSMK Inv. Co*, 651 F.3d at 274.  Plaintiffs here are differently situated than the plaintiffs in *Bald Eagle* and progeny because Plaintiffs assert a claim that stands independently from any misrepresentations to investors, which allegedly victimized a completely different group.

For these reasons, Plaintiffs' claims should not be dismissed on PSLRA grounds.

---

[7] At oral argument, Defendants cited another Madoff-related case, *Picard v. Kohn*, 907 F. Supp. 2d 392, 396 (S.D.N.Y. 2012).  Argument Tr. at 10:17–23.  That suit was brought by victims of securities fraud against intermediaries who assisted Madoff in inducing investors into the Ponzi scheme, and is thus inapt.  *Picard*, 907 F. Supp. 2d at 396.

### C.    Plaintiffs Sufficiently Allege RICO Predicate Acts

Defendants argue that the case should be dismissed because Plaintiffs fail to plead RICO predicate acts sufficiently.  Def. Mem. at 11.  On its face, this argument is difficult to square with the Amended Complaint.  As Defendants' motion recognizes, Plaintiffs' RICO claims are predicated on the "alleged collection of unlawful debt, wire fraud, extortionate credit transactions, obstruction of justice, conspiracy to obstruct justice, and perjury in connection with the MCA Agreements."  Def. Mem. at 11.  *See* Am. Compl. ¶¶ 65–114.  If credited, these allegations would be more than sufficient to prove RICO predicate acts.

Defendants nonetheless argue that, based on judicially-noticeable court documents, Plaintiffs make no *plausible* allegation of any RICO violation grounded in the entry and enforcement of the MCA Agreements.  More specifically, Defendants argue:  (1) Plaintiffs fail to make plausible allegations that the MCA Agreements are unlawful loans, and (2) even if characterized as loans, the MCA Agreements are not usurious as a matter of law.  Def. Mem. at 12-18.  After attacking the sufficiency of Plaintiffs' claims as to the MCA Agreements, Defendants also challenge the legal sufficiency of Plaintiffs' allegations of other RICO predicate acts.  Def. Mem. At 18-19.

### 1.    The Receivership Action Does Not Render Implausible Plaintiffs' Allegations Concerning the MCA Agreements

Defendants first contend that Plaintiffs' allegations that the MCA Agreements are unlawful loans are implausible because the court presiding over the Receivership Action has authorized the Receiver to continue collections under these

agreements.  Def. Mem. at 12.  Defendants claim it is "clearly baseless" to allege that the Receiver, with court authorization, would collect on unlawful debt.  *Id.* at 13 (quoting *Gallop v. Cheney*, 642 F.3d 364, 368 (2d Cir. 2011)).  As a result, Defendants claim that Plaintiffs "cannot plausibly allege that the MCA Agreements were usurious loans."  Def. Mem. at 14.

Notably, Defendants never assert that Plaintiffs' claims as to the MCA Agreements are barred by the doctrines of claim preclusion (res judicata) or issue preclusion (collateral estoppel).  At oral argument, Defendants acknowledged that the Receivership Action has not resulted in any final judgment on the merits precluding a claim that the MCA Agreements are unlawful and unenforceable. Argument Tr. at 8–9.  Nor have Defendants advanced an argument that this Court should defer to the Receivership Action based on any equitable abstention doctrine or broader principles of judicial comity.  Finally, Defendants have not asserted that allowing this action to proceed against the Chehebars would interfere with the ongoing work of the Receiver.

Instead, Defendants' argument boils down to the assertion that Plaintiffs challenge to the MCA Agreements is not plausible because, if it had any merit, the court presiding over the Receivership Action would have blocked the Receiver from continuing to enforce the MCA Agreements.  This argument requires the Court to assume too much about the Receivership Action and to give too little credit to the allegations made in the Amended Complaint that the MCA Agreements are unlawfully usurious loans.

Starting with the information regarding the Receivership Action that is presented on this motion, it appears that the purpose of that proceeding is to maintain CBSG as a going concern for the benefit of its investors.  Accordingly, the court in that proceeding appointed the Receiver to "administer and manage the Receivership Entities' business affairs, funds, assets, causes of action, and any other property; marshal and safeguard all of the assets of the Receivership Entities; and take whatever actions are necessary for the *protection of the investors*."  Fl. Dkt. No. 36 at 2 (emphasis added).  The MCA Agreements are assets of the Receivership Entities and it appears the Receiver has continued to enforce them for the benefit of investors.

In this context, the Receiver proposed an initial claims distribution plan.  A number of merchants, including several Plaintiffs in this case, objected to the Receiver's proposed plan.  Fl. Dkt. No. 1887.  In support of their objections, these merchants advanced many of the same arguments about the MCA Agreement that Plaintiffs present here.  *Id.*; Fl. Dkt. No. 1929.  Defendants point out the court in the Receivership Action overruled the merchants' objections.  Fl. Dkt. No. 1976 at 36–37.  By itself, and in the absence of any argument that this ruling has some preclusive effect, the fact that another court operating in a very different context was not persuaded to halt enforcement of the MCA Agreements does not render Plaintiffs' allegations inherently implausible.  The Receivership Action has a particular purpose – the protection of investors in CBSG – that involves considerations that are different from what is at issue in this proceeding:  Plaintiffs'

claims against the Chehebars.[8]  While it is possible that the Receivership Action could result in a preclusive final judgment, that has not occurred yet.

Further, giving such weight to developments in the pending Receivership Action would require this Court to ignore the extensive allegations in the Amended Complaint that the MCA Agreements are unenforceable loans.  For example, Plaintiffs allege that CBSG's written marketing materials to potential investors, which are excerpted in the Amended Complaint, repeatedly described the MCA Agreements as loans with extraordinarily high interest rates.  Am. Compl. ¶¶ 15–20.  Further, the MCA Agreements were allegedly described as loans in communications with Defendants.  Am. Compl. ¶ 23.

Additionally, the Amended Complaint alleges specific attributes of the MCA Agreements that render them loans "as a matter of law."  Am. Compl. ¶ 68.  In support of these allegations, Plaintiffs' opposition brief highlights certain provisions of the MCA Agreements,[9] citing a summary order from the Second Circuit describing six factors to be considered in determining whether a merchant cash advance agreement is actually a loan.  *See* Pl. Mem. at 18, *citing Fleetwood Servs.,*

---

[8] To be sure, there is a tension between Plaintiffs' reliance on the Receivership Action to toll the statute of limitations and their argument that this same proceeding has no bearing on the plausibility of their allegations that the MCA Agreements are disguised loans.  Both sides have relied on the Receivership Action where it has suited them.  At the pleading stage, however, all reasonable inferences must be drawn in Plaintiffs' favor.

[9] Both sides present arguments on this Rule 12 motion based on the text of exemplar MCA Agreements.  Neither side suggests it is improper for the Court to consider the MCA Agreements on this motion.  Because the Amended Complaint repeatedly refers to the MCA Agreements and relies heavily on their terms and effect, they are integral to the Amended Complaint and can be considered on this Motion.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

*LLC v. Richmond Capital Grp. LLC*, 2023 U.S. App. LEXIS 14241 (2d Cir. June 8, 2023). These factors include (1) whether there is a reconciliation provision; (2) whether there is a finite term; (3) where there is recourse in the event of bankruptcy; (4) whether particular accounts or revenue streams are identified; (5) whether the merchant is responsible to collect future receipts; and (6) whether just a few missed payments can trigger a default. Based on the MCA Agreement attached to Defendants' own motion, Plaintiffs argue that each of these factors weighs in favor of a finding that the MCA Agreements are actually loans. *See* Pl. Mem. at 19–22. This analysis is completely unrebutted in Defendants' reply brief. Based on the foregoing, the Amended Complaint plausibly alleges that the MCA Agreements are loans.

### 2. Plaintiffs' Case Should Not Be Dismissed on Choice-of-Law Grounds

Next, Defendants argue that, even assuming that the MCA Agreements are loans, Plaintiffs fail to state a claim because the MCA Agreements do not violate any usury laws. Def. Mem. at 14. Defendants' argument rests on a choice-of-law provision contained in the MCA Agreements, which requires Pennsylvania law to govern all disputes. *Id.* at 15. Pennsylvania law does not recognize usury as an offense in commercial loans and, should it govern, Plaintiffs would not be able to allege that CBSG collected on unlawful debt. *Id.* Plaintiffs respond that this choice-of-law provision is unenforceable and that the Court should instead apply either the law of Florida, where they allege CBSG was actually based, or the laws of the home states of the Plaintiffs: New Jersey, Massachusetts, New York, and

California.  Pl. Mem. at 15.  These states all recognize usury in commercial lending as a crime.  *Id.*

Defendants' argument fails because the Court cannot determine at the pleading stage that Pennsylvania law governs.  Neither party explained why the Court should apply anything other than New York law in deciding the effectiveness of the choice-of-law clause in the MCA Agreements.  Defendants apparently assumed that New York law applies, while Plaintiffs presented arguments based on other authorities without explaining why they are controlling.  "In a federal question action where a federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state." *Manning Int'l Inc. v. Home Shopping Network, Inc.*, 152 F. Supp. 2d 432, 436 n.3 (S.D.N.Y. 2001).  This is the case even when the parties have a contract which includes a choice-of-law provision.  *See Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc.,* 414 F.3d 325, 332 (2d Cir. 2005) ("The validity of a contractual choice-of-law clause . . . must be decided . . . under the relevant forum's choice-of-law rules governing the effectiveness of such clauses.").

Under New York law, "absent fraud or a violation of public policy, courts will uphold a choice-of-law clause so long as the state selected has sufficient contacts with the transaction."  *Innovative BioDefense, Inc. v. VSP Techs., Inc.*, No. 12 Civ. 3710 (ER), 2013 WL 3389008, at *3 (S.D.N.Y. July 3, 2013) (citing *Int'l Mins. & Res., S.A. v. Pappas*, 96 F.3d 586, 592 (2d Cir. 1996)).  Even if such a clause is enforced, however, "the contractual choice-of-law clause does not reach tort claims."

*Fin. One*, 414 F.3d at 334 (citing *Knieriemen v. Bache Halsey Stuart Shields Inc.*, 74 A.D.2d 290, 427 N.Y.S.2d 10, 12–13 (1st Dep't 1980), as the "leading New York case" on this issue).

"Under the law of New York, the forum state, the first step in a choice of law analysis is to determine whether an actual conflict exists between the laws of the jurisdictions involved." *Forest Park Pictures v. Universal Tel. Network, Inc.*, 683 F.3d 424, 433 (2d Cir. 2012). Where an actual conflict exists, "New York courts seek to apply the law of the jurisdiction with the most significant interest in, or relationship to, the dispute." *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 (2d Cir. 1997) (*citing Brink's Ltd. v. South African Airways*, 93 F.3d 1022, 1030 (2d Cir. 1996)); *see also Forest Park Pictures*, 683 F.3d at 433. Defendants do not dispute that an actual conflict exits as to whether usury in commercial lending is a crime.

The application of New York choice-of-law rules to the facts alleged here would require complex and detailed analysis not only of the relationship between CBSG and the state of Pennsylvania, but the nexus between CBSG and Florida as well, in addition to the public policy interests of California, New Jersey, New York, and Massachusetts. This analysis is by its very nature fact-intensive. Therefore, making a determination on the merits of the parties' respective positions on the choice-of-law provisions is often not appropriate at the motion to dismiss stage. *See, e.g., Holborn Corp. v. Sawgrass Mut. Ins. Co.*, 304 F. Supp. 3d 392, 398 (S.D.N.Y.

2018) ("Because a choice of law analysis is fact intensive, courts often decline to make a choice of law determination at the motion to dismiss stage.").

The Amended Complaint contains plausible allegations that, if credited, would prevent enforcement of the choice-of-law provisions contained in the MCA Agreements.  More specifically, the Amended Complaint alleges that the enterprise was not actually based in Pennsylvania and that the MCA Agreements lacked sufficient minimum contacts with Pennsylvania.  Am. Compl. ¶¶ 69, 94–96, 108–14. It further alleges that the CBSG enterprise represented that it was based in Florida in order to avoid paying Pennsylvania taxes.  Am. Compl. ¶¶ 72, 94–96, 108–14. These allegations must be considered in light of New York's strong public policy against usury.  *Samson Lending LLC v. Greenfield Mgt. LLC*, 80 Misc. 3d 1023, 1031 (Sup. Ct. 2023) ("Multiple court decisions have determined that New York laws against usury constitute fundamental public policy").  The Amended Complaint makes plausible allegations that, if credited, would provide a basis not to enforce the MCA Agreements' choice-of-law provisions.

For these reasons, it would not be appropriate to decide that Pennsylvania law necessarily governs at the pleading stage.

### 3.    The Amended Complaint Properly Pleads a Pattern of RICO Predicate Acts

Premised on the assumption that Plaintiffs fail to allege unlawful debt collection, Defendants attack some of the other predicate acts that Plaintiffs allege, including perjury and obstruction of justice.  Def. Mem. at 18–19.

28

It does not appear, however, that Defendants challenge Plaintiffs' allegations of extortion in their moving brief. Instead, they appear to claim that allegations of extortion *alone* are insufficient. *See* Def. Mem at 19 (emphasizing the need to plausibly allege at least two predicate acts).[10] But such an argument assumes that Plaintiffs have not properly alleged unlawful debt collection, which they have. Nor can Defendants' claim that the acts of extortion alleged the Amended Complaint are unrelated to the collection of unlawful debt. Paragraphs 78–89 of the Amended Complaint plainly allege harassment, threats of physical violence and duress, conducted by individuals supposedly connected with organized crime, in order to collect under the MCA Agreements.

Because the Plaintiffs sufficiently allege multiple acts of the collection of unlawful debts and extortion in relation to the collection of unlawful debts, Plaintiffs have properly alleged a "pattern of racketeering activity" necessary to state a claim under 18 U.S.C. § 1962(c).

### D. Defendants' *Rooker-Feldman* and Res Judicata Arguments are Moot

The Amended Complaint alleges that as part of collecting on the MCA Agreements, CBSG obtained numerous confessions of judgment against borrowers in state courts. Specifically, Plaintiffs write that:

> Plaintiffs and the Class Members who entered into these loans invariably could not keep up with the usurious interest rates, and since at least 2016, the Enterprise has filed nearly 2,500 confessions of judgment against its small business victims and their individual

---

[10] At oral argument, Defendants advanced a new argument as to Plaintiffs' extortion claims that was not included in their briefing. *See* Argument Tr. at 21. This new argument is not properly considered on this motion.

> owners. Over 750 were filed right here in the State of New York, and
> thousands of others were filed across the United States. These
> confessions of judgment, among other unlawful collection tactics, show
> that the Enterprise treated the transactions as absolutely repayable
> loans.

Am. Compl. ¶ 24. Seizing on this paragraph, Defendants argue that one of the aims

of this action is to overturn these state court confessions of judgment. This, they

argue, would run afoul both the *Rooker-Feldman* doctrine and res judicata. Def.

Mem. at 19–22.

The *Rooker-Feldman* doctrine deprives federal courts of subject matter

jurisdiction in "cases brought by state-court losers complaining of injuries caused by

state-court judgments rendered before the district court proceedings commenced

and inviting district court review and rejection of those judgments." *Exxon Mobil

Corp. v. Saudi Basic Indus.,* 544 U.S. 280, 284 (2005). Defendants argue that this

litigation constitutes such an effort to overturn state court confessions of judgment

entered against them after they failed to make payments on the MCA Agreements.

Def. Mem. at 19–20.

Res judicata prevents parties from attempting to relitigate issues that were

or could have been raised in a previous proceeding. *Monahan v. New York City

Dep't of Corrections*, 214 F.3d 275, 284 (2d Cir. 2000). Consistent with their *Rooker-

Feldman* argument, Defendants contend that the present action is an attempt to

relitigate the state court confessions of judgment. Def. Mem. at 21–22.

These issues were explored in greater detail during oral argument. While the

significance of Paragraph 24 of the Amended Complaint is far from clear, it

arguably suggests that Plaintiffs are asking this Court to relieve them from the

effect of state court judgments that have not already been vacated through state court proceedings. If Plaintiffs were seeking such relief, Defendants would be right to question whether this Court has subject matter jurisdiction and, if so, whether providing such relief would run afoul the doctrine of res judicata. During oral argument, however, Plaintiffs made representations about their claim – to which they should be held – that moot these issues. More specifically, Plaintiffs expressly stated that none of the named Plaintiffs has an outstanding confession of judgment, *i.e.*, a confession of judgment that was entered but that was not later vacated. Tr. at 46:19–24. Moreover, counsel represented that, should a class be certified, the prospective class would not include any individual or business with an un-voided confession of judgment. *Id.* at 48:3–9.

Given these representations that the named Plaintiffs do not have outstanding confessions of judgment against them, and the class will not contain any entities that do, it is not necessary to consider the issues Defendants have raised based on res judicata and the *Rooker-Feldman* doctrine. Plaintiffs' claims, as limited by their counsel at oral argument, do not trigger these concerns and their case should not be dismissed on these grounds. To the extent Paragraph 24 of the Amended Complaint suggests that there are outstanding confessions of judgment against the named Plaintiffs, the proper remedy would not be dismissal, but would be to require Plaintiffs to amend their pleadings to be consistent with the representations made at oral argument.

V.    **CONCLUSION**

For the foregoing reasons, the Defendants' motion to dismiss, Dkt. No. 43.

should be **DENIED**.

**PROCEDURE FOR FILING OBJECTIONS**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

Procedure, the parties shall have fourteen (14) days from service of this Report and

Recommendation to file written objections.  *See also* Fed. R. Civ. P. 6.  Such

objections, and any responses to such objections, shall be filed with the Clerk of

Court, with courtesy copies delivered to the chambers of the Honorable Gregory H.

Woods, United States Courthouse, 500 Pearl Street, New York, NY 10007.  Any

requests for an extension of time for filing objections must be directed to Judge

Woods.

**FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS**

**WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE**

**APPELLATE REVIEW.** 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.  *See Thomas v.*

*Arn*, 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis,*

*Brittingham, Gladd & Carwile, P.C.*, 596 F.3d 84, 92 (2d Cir. 2010).

    Dated: December 20, 2024
        New York, New York

_____
Hon. Henry J. Ricardo
United States Magistrate Judge