```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/17/2025
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------- X
                                   :

B & T SUPPLIES, INC., *et al.*,          :

                                   :

                 Plaintiffs,    :         1:23-cv-11241-GHW

                                   :

             -v-                 :      MEMORANDUM OPINION &

                                   :              ORDER

GEMJ CHEHEBAR GRAT, LLC, *et al.*,   :

                                   :

                 Defendants.   :

                                   :

-------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

## I.    INTRODUCTION

        Defendants provided funding to a criminal enterprise that, among other things, extended

"merchant cash advances" to small businesses and then threatened violence to compel repayment.

Plaintiffs are small businesses and small business owners, all of whom were extended merchant cash

advances by the enterprise.  The enterprise labeled these transactions as purchases of receivables,

but Plaintiffs claim that the transactions were in actuality usurious loans.  Plaintiffs commenced this

action against Defendants, pursuant to 18 U.S.C. § 1962(d), for willful participation in the collection

of unlawful debt and a pattern of racketeering.

        Defendants have filed two motions to dismiss.  Defendants filed the first motion on the

grounds that Plaintiffs' claims are barred by the statute of limitations; that Plaintiffs' claims are

barred by the Private Securities Litigation Reform Act (the "PSLRA"); that Plaintiffs have failed to

allege RICO predicate acts; and that the Court lacks subject matter jurisdiction, in accordance with

the *Rooker-Feldman* doctrine.  Defendants' second motion asserts that Plaintiffs' claims are precluded

by collateral estoppel.  Magistrate Judge Henry J. Ricardo issued a report and recommendation on

Defendants' first motion to dismiss.  For the following reasons, the report and recommendation is

adopted in part and modified in part; and both of Defendants' motions to dismiss are DENIED.

## II.    BACKGROUND

### A.  Facts[1]

#### 1.  Parties

Defendant GemJ Chehebar Grat, LLC ("GemJ") is a Delaware limited liability company. Dkt. No. 38 ("Am. Compl.") ¶ 40.  Defendant Josef Chehebar is a manager of GemJ and a resident of New York.  *Id.* ¶ 41.  Defendant Isaac Shehebar is also a resident of New York.  *Id.* ¶ 42.  This opinion refers to the defendants collectively as the "Chehebars."

Non-party Complete Business Solutions Group, Inc. ("CBSG") is a Delaware corporation. *Id.* ¶ 50.  CBSG and its affiliates "were in the business of funding businesses [] through short-term financing transactions."  *Id.*  CBSG called these transactions "merchant cash advances" ("MCAs"). *Id.*  Plaintiffs are small businesses and business owners who entered into "merchant cash advance agreements" (the "MCA Agreements") with CBSG.  *Id.* ¶¶ 115–76.

#### 2.  The MCA Agreements

Pursuant to the MCA Agreements, CBSG "purported to purchase [] merchants' future receivables at a discounted price."  *Id.* ¶ 50.  However, the MCA Agreements "never identified any specific receivables [CBSG] was purchasing."  *Id.* ¶ 68.  A lump sum was simply given to the merchants for the merchants to use to operate their businesses.  *Id.* ¶ 50.  The merchants, not CBSG, were responsible for collecting the "receivables" and "depositing them into the designated bank account from which [CBSG] would draw the ACH debits."  *Id.* ¶ 68.  "The merchant agreed to

---

[1] At the motion to dismiss stage, the Court accepts the following facts set forth in the Amended Complaint, Dkt. No. 38.  The Court also considers all documents attached as exhibits to the Amended Complaint.  *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (explaining that in considering a motion to dismiss, "a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint").  And because the motion to dismiss raises collateral estoppel and *res judicata*, the Court takes judicial notice of prior pleadings, orders, transcripts, and judgments in prior proceedings related to this case.  *Jianjun Lou v. Trutex, Inc.*, 872 F. Supp. 2d 344, 349 n.6 (S.D.N.Y. 2012) ("In the Rule 12(b)(6) context, a court may take judicial notice of prior pleadings, orders, judgments, and other related documents that appear in the court records of prior litigation and that relate to the case *sub judice*.").

repay CBSG the purchase price advanced to it plus an additional amount, which was typically 30% or more of the purchase price." *Id.* ¶ 50. "CBSG generally collected these deferred repayments in installments through automatic daily or weekly debits from the merchant's bank accounts." *Id.* The result was that the merchants paid "interest rates between at least 100% and 400% per annum." *Id.*

Pursuant to the MCA Agreements, CBSG had "full recourse to collect on the balance owed" and "had full recourse to demand full accelerated repayment . . . in the event of a merchant's bankruptcy." *Id.* ¶ 68. While the MCA Agreements had reconciliation provisions, "the Enterprise could and did arbitrar[ily] deny all reconciliation requests per its 'sole discretion' right." *Id.* "Missing just four payments resulted in default with full acceleration." *Id.* And the result was that the Enterprise would be "able to collect through either (i) direct debiting the entire balance from the merchant's bank accounts; (ii) filing confessions of judgment; (iii) taking a security interest in the entire merchant's assets; and/or (iv) holding the merchant's owner responsible for the balance." *Id.* The MCA Agreements also had Pennsylvania choice-of-law provisions. *Id.* ¶ 69.

"CBSG frequently entered 'reload' agreements with merchants, which were essentially refinancings of pre-existing MCAs." *Id.* ¶ 50. "In a reload, CBSG's new, larger advance typically repaid the amount due on the original advance and provided some additional funding to the merchant." *Id.* "In order to fund these MCAs, CBSG raised capital through the issuance of promissory notes with the Chehebars." *Id.* The promissory notes issued to Defendants "contained a Security Agreement, which granted the Chehebars a security interest in substantially all of the assets of CBSG its accounts receivables [sic]." *Id.* ¶ 61.

### 3.  The RICO Enterprise and the Chehebars' Involvement

Plaintiffs allege that the Chehebars and CBSG were members of a criminal enterprise (the "Enterprise"), "engaged in various types of criminal activity, including but not limited to wire fraud, extortionate collection of debt, perjury, obstruction of justice, witness tampering, and witness

retaliation." *Id.* ¶ 48.  Plaintiffs claim that the MCA Agreements constituted usurious loans and that therefore the Enterprise engaged in unlawful debt collection.  *Id.* ¶¶ 65–70.  Plaintiffs also allege that the Enterprise engaged in extortion by violently threatening debtors and their families, by "confessing judgments against merchants for amounts that [were] grossly exaggerated" where no underlying breach had occurred, and by taking personal property as collateral "via threats of violence." *Id.* ¶¶ 78–89.  Since at least 2016, the Enterprise has filed "nearly 2,500 confessions of judgment against its small business victims and their individual owners." *Id.* ¶ 24.

"The Chehebars funded the Enterprise by injecting the necessary capital to fund the Enterprise and the criminally usurious loans issued to small business merchants, including Plaintiffs." *Id.* ¶ 55.  The Chehebars also entered into consulting agreements with CBSG, *see* Dkt. No. 38-4, whereby the Chehebars would "in consultation with [CBSG], . . . assist [CBSG] in establishing contact with potential investors," *id.* at 1, 10.  The agreements specified that the Chehebars would "act strictly in a professional consulting capacity as an independent contractor for all purposes" and would "not be considered an employee of [CBSG] or its affiliates." *Id.*  "As a result of these fundraising efforts, the Chehebars received millions of dollars in consulting payments, as well as 25% interest payments on the capital advanced to the Enterprise." Am. Compl. ¶ 60.

### 4.  The Receivership Action

CBSG is the subject of an action commenced by the SEC on July 24, 2020, (the "Receivership Action") in the U.S. District Court for the Southern District of Florida before Judge Rodolfo A. Ruiz, II (the "Receivership Court").  *See SEC v. Complete Business Solutions Group, Inc.*, No. 20-cv-81205 (RAR) (S.D. Fla.) (hereinafter "Fla. Dkt."), Dkt. No. 1.  The SEC alleges that CBSG sold unregistered securities to the investing public and otherwise defrauded investors. *Id.* ¶ 4.  On July 27, 2020, Judge Ruiz appointed a Receiver for CBSG and its affiliated entities.  Fla. Dkt. No. 36. On July 31, 2020, Judge Ruiz issued a stay of

> [a]ll civil legal proceedings of any nature, including, but not limited to, bankruptcy proceedings, arbitration proceedings, foreclosure actions, default proceedings, or any other actions of any nature involving: (a) the Receiver, in his capacity as Receiver; (b) any of the Receivership Entities' property interests, wherever located; (c) any of the Receivership Entities, including subsidiaries and partnerships; or, (d) any of a Receivership Entity's past or present officers, directors, managers, agents, or general or limited partners sued for, or in connection with, any action taken by them while acting in such capacity of any nature, whether as plaintiff, defendant, third-party plaintiff, third-party defendant, or otherwise.

Fla. Dkt. No. 56 (the "Stay Order") at 4. The Stay Order provided that "any applicable statute of limitation is tolled during the period in which this injunction against commencement of legal proceedings is in effect." *Id.*

On April 22, 2024, the Receiver filed a motion in the Receivership Action to approve the Receiver's proposed treatment of claims. Fla. Dkt. No. 1843 (the "Claims Motion"). On May 7, 2024, a group of non-party merchants, including a number of the plaintiffs in this action represented by the same counsel as in this action, filed a memorandum opposing the Claims Motion. Fla Dkt. No. 1887. The merchants objected to the Receiver's decision to deny their claims against CBSG, arguing among other things that the MCA Agreements are usurious loans. *Id.* at 11–14. The Receiver filed a reply on May 21, 2024. Fla. Dkt. No. 1929.

On June 26, 2024, the Receivership Court granted the Claims Motion, approving the Receiver's determination of claims and overruling the merchants' objections. Fla. Dkt. No. 1976 (the "Claims Decision"). The Claims Decision sets out the legal standard for approving the Receiver's determinations: "The court may approve the proposed treatment of claims and distribution of the assets of a receivership estate in a manner that it deems fair and equitable." *Id.* at 11. As to the merchants' objections, the Claims Decision states that the Receivership Court "carefully reviewed the Receiver's proposed claim determinations for these merchants, the arguments and factual information contained within the merchants' Responses to the Claims Motion, and the detailed claims files, notices of determination, and objections to the Receiver's

determinations for those disputed claims that are the subject of the merchants' Responses." *Id.* at

37.  The Claims Decision overruled the merchants' objections with little to no further explanation:

> Based on this review, the Court determines that the merchants' objections to the
> Claims Motion are OVERRULED.  Additionally, the Court finds that the Receiver's
> claims determinations for these merchants are well supported and reasonable.
> Accordingly, the Court finds by a preponderance of the evidence, based on a careful
> review of the record, that the Receiver's ultimate rejection of the merchants' claims is
> reasonable.  Therefore, the Receiver's claims determinations as to the merchants'
> claims are APPROVED.

*Id.*

On July 19, 2024, the merchants appealed the Claims Decision, *see* Fla. Dkt. No. 1996, but

the Eleventh Circuit held that it lacked appellate jurisdiction because the Claims Decision was not a

final, appealable order, *SEC v. Complete Bus. Sols. Group, Inc.*, No. 24-12350, 2024 WL 4785772, at *1

(11th Cir. Nov. 14, 2024).  On December 16, 2024, the Receivership Court entered an order

approving the Receiver's proposed distribution plan and authorizing a first interim distribution.  Fla.

Dkt. No. 2078.

### B.  Procedural History

Plaintiffs commenced this action on December 28, 2023.  Dkt. No. 1.  On January 2, 2024,

the case was referred to the assigned magistrate judge for general pretrial and dispositive motions.

Dkt. No. 3.  Plaintiffs filed the Amended Complaint on June 28, 2024.  Dkt. No. 38.  Plaintiffs' sole

cause of action arises under 18 U.S.C. § 1962(d); Plaintiffs claim that Defendants acted in concert

with members of the Enterprise to engage in "collection of unlawful debt and a pattern of

racketeering." *Id.* ¶ 198.  Plaintiffs have voluntarily dismissed their claims against most of the named

defendants without prejudice pursuant to Rule 41(a)(1)(A)(i).  *See* Dkt. Nos. 33, 34, 41, 42.

On July 19, 2024, the remaining defendants, GemJ, Josef Chehebar, and Isaac Shehebar,

moved to dismiss the Amended Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal

Rules of Civil Procedure.  The parties briefed the motion, Dkt. Nos. 44–47, and were heard at oral

argument on October 30, 2024, before Magistrate Judge Henry J. Ricardo.  On December 20, 2024, Judge Ricardo issued a report and recommendation, which recommends that the Court deny Defendants' motion to dismiss.  Dkt. No. 55 (the "R&R").  Defendants filed objections to the R&R on January 3, 2025.  Dkt. No. 56 (the "Def. Objections").  Plaintiffs filed a response to the objections on January 30, 2025.  Dkt. No. 62 (the "Pl. Response").  With leave of the Court, Defendants filed a reply on February 14, 2025.  Dkt. No. 69.

On January 24, 2025, Defendants filed a second motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), arguing that Plaintiffs are collaterally estopped from claiming that the MCA Agreements are usurious loans.  Dkt. No. 59.  Defendants filed a memorandum of law in support of their motion on January 24, 2025.  Dkt. No. 60.  Plaintiffs filed a brief in opposition on January 31, 2025.  Dkt. No. 64.  Defendants filed a reply on February 7, 2025.  Dkt. No. 68.  So as to resolve all outstanding issues at once, the Court is withdrawing the referral of this case with respect to the resolution of Defendants' January 24, 2025, motion to dismiss.

### C.  The R&R

Judge Ricardo's R&R recommends that the Court deny Defendants' first motion to dismiss. *See* R&R at 2, 32.  First, the R&R concludes that Plaintiffs' claims are not time barred.  The R&R finds that the claims of Plaintiffs B and T Supplies, Inc. ("B&T"); Tzvi Odzer; RKDK, Inc. ("RKDK"); Gelato on Hudson LLC ("Gelato"); Daniel Shah; Asia Star Broadcasting Inc. ("ASB"); MH Marketing Solutions Group, Inc. ("MHMSG"); and Michael Heller accrued more than four years prior to the commencement of this action. *Id.* at 13–14.  However, the R&R concludes that Plaintiffs' claims were tolled by the Stay Order because Plaintiffs plausibly allege that Defendants were agents of CBSG. *Id.* at 14–17.  As a result, the R&R concludes that all Plaintiffs' claims are timely. *Id.* at 16–17.  Second, the R&R concludes that the PSLRA does not bar Plaintiffs' claims because the claims "do not rely on conduct that would have been actionable—by someone—as

fraud in the purchase or sale of securities." *Id.* at 20.

Third, the R&R concludes that Plaintiffs sufficiently allege RICO predicate acts even though the Claims Decision did not find that the MCA Agreements are usurious loans. *Id.* at 21. Specifically, the R&R concludes that the judgment of the Receivership Court, "operating in a very different context," "does not render Plaintiffs' allegations inherently implausible." *Id.* at 23. To the contrary, the R&R finds that "the Amended Complaint alleges specific attributes of the MCA Agreements that render them loans as a matter of law." *Id.* at 24 (internal quotation marks omitted). In response to Defendants' argument that Pennsylvania law does not recognize usury as an offense in commercial loans, the R&R recommends that the Court refrain from conducting choice-of-law analysis at this stage because the allegations create a fact-intensive question as to what state law applies to Plaintiffs' claims. *Id.* at 25–28. Additionally, the R&R finds that the Amended Complaint adequately pleads a second predicate act—extortion. *Id.* at 29.

Fourth, the R&R concludes that the Court has subject matter jurisdiction despite Defendants' invocation of the *Rooker-Feldman* doctrine and *res judicata*. *Id.* at 31. At oral argument, Plaintiffs "made representations about their claim," specifically that "none of the named Plaintiffs has an outstanding confession of judgment," and that "should a class be certified, the prospective class would not include any individual or business with an un-voided confession of judgment." *Id.* The R&R recommends that Plaintiffs be held to these representations and that therefore Plaintiffs' claims not be dismissed on *Rooker-Feldman* or *res judicata* grounds. *Id.*

## III.  LEGAL STANDARD

### A.  Rule 12(b)(1)

"A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Daly v. Citigroup Inc.*, 939 F.3d 415, 425 (2d Cir. 2019) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir.

2000)); *see also* Fed. R. Civ. P. 12(b)(1) ("[A] party may assert the following defense[] by motion: lack of subject-matter jurisdiction."). "The burden of proving jurisdiction is on the party asserting it." *Daly*, 939 F.3d at 425 (quoting *Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir. 1994)). On a Rule 12(b)(1) motion, "the court is permitted to rely on information beyond the face of the complaint." *In re Germain*, 824 F.3d 258, 261 (2d Cir. 2016) (quoting *St. Paul Fire & Marine Ins. Co. v. Universal Builders Supply*, 409 F.3d 73, 80 (2d Cir. 2005)).

### B. Rule 12(b)(6)

Under Fed. R. Civ. P. 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 110–11 (2d Cir. 2010). To avoid dismissal, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A formulaic recitation of the elements of a cause of action, devoid of supporting facts, does not suffice. *Id.* To satisfy the "plausibility" requirement, the plaintiff must plead facts that permit the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However,

> "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." A complaint must therefore contain more than "naked assertion[s] devoid of further factual enhancement." Pleadings that contain "no more than conclusions . . . are not entitled to the assumption of truth" otherwise applicable to complaints in the context of motions to dismiss.

*DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (alterations in original) (quoting *Iqbal*, 556 U.S. at 678–79). Thus, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557).

On a motion to dismiss, a court must generally "limit itself to the facts stated in the complaint." *Field Day, LLC v. Cnty. of Suffolk*, 463 F.3d 167, 192 (2d Cir. 2006) (quoting *Hayden v. Cnty. of Nassau*, 180 F.3d 42, 54 (2d Cir. 1999)). A court may also consider "documents attached to the complaint as exhibits, . . . documents incorporated by reference in the complaint . . . [and] document[s] integral to the complaint." *DiFolco*, 622 F.3d at 111 (internal quotation marks and citation omitted). In the Rule 12(b)(6) context, "[a] court's task is to assess the legal feasibility of the complaint; it is not to assess the weight of the evidence that might be offered on either side." *Lynch v. City of New York*, 952 F.3d 67, 75 (2d Cir. 2020). "The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006). "The Rule thus assesses the legal feasibility of the complaint but does not weigh the evidence that might be offered to support it." *Id.*

"[I]t is well settled that a court may dismiss a claim on *res judicata* or collateral estoppel grounds on a Rule 12(b)(6) motion." *Linden Airport Mgmt. Corp. v. New York City Econ. Dev. Corp.*, No. 08-cv-3810 (RJS), 2011 WL 2226625, at *3 (S.D.N.Y. June 1, 2011) (internal quotation marks omitted) (quoting *Sassower v. Abrams,* 833 F. Supp. 253, 264 n.18 (S.D.N.Y. 1993)). "When a defendant raises *res judicata* or collateral estoppel as an affirmative defense and 'it is clear from the face of the complaint, and consideration of matters which the court may take judicial notice of, that the plaintiff's claims are barred as a matter of law,' dismissal under Rule 12(b)(6) is appropriate." *Id.* (quoting *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000)). "[C]ourts routinely take judicial

notice of documents filed in other courts, again not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991).

### C. Standard of Review of a Report and Recommendation

A district court reviewing a magistrate judge's report and recommendation "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1).  Parties may raise specific, written objections to the report and recommendation within fourteen days of being served with a copy of the report.  *Id.*; *see also* Fed. R. Civ. P. 72(b)(2).

The Court reviews for clear error those parts of the report and recommendation to which no party has timely objected.  28 U.S.C. § 636(b)(1); *Lewis v. Zon*, 573 F. Supp. 2d 804, 811 (S.D.N.Y. 2008).  When a party timely objects to a magistrate's report and recommendation, a district court reviews, *de novo*, "those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1).  "To the extent . . . that the party makes only conclusory or general arguments, or simply reiterates the original arguments, the Court will review the Report strictly for clear error." *Indymac Bank, F.S.B. v. Nat'l Settlement Agency, Inc.*, No. 07-cv-6865 (LTS)(GWG), 2008 WL 4810043, at *1 (S.D.N.Y. Nov. 3, 2008); *see also Ortiz v. Barkley*, 558 F. Supp. 2d 444, 451 (S.D.N.Y. 2008) ("Reviewing courts should review a report and recommendation for clear error where objections are merely perfunctory responses, argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original petition." (citation and internal quotation marks omitted)).  "Objections of this sort are frivolous, general and conclusory and would reduce the magistrate's work to something akin to a meaningless dress rehearsal." *Vega v. Artuz*, No. 97-cv-3775 (LTS)(JCF), 2002 WL 31174466, at *1 (S.D.N.Y. Sept. 30, 2002) (citations and internal quotation marks omitted).  "The purpose of the Federal Magistrates Act was to

promote efficiency of the judiciary, not undermine it by allowing parties to relitigate every argument which it presented to the Magistrate Judge." *New York City Dist. Council of Carpenters Pension Fund v. Forde*, 341 F. Supp. 3d 334, 336 (S.D.N.Y. 2018) (internal citation and quotation marks omitted).

Finally, "it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not." *United States v. Gladden*, 394 F. Supp. 3d 465, 480 (S.D.N.Y. 2019) (internal citation and quotation marks omitted); *accord Piligian v. Icahn Sch. of Med. at Mt. Sinai*, 490 F. Supp. 3d 707, 716 (S.D.N.Y. 2020) ("[N]ew arguments and factual assertions cannot properly be raised for the first time in objections to the report and recommendation, and indeed may not be deemed objections at all." (quoting *Syed Mohammad Aftab Kartm, MD, Faans v. New York City Health and Hospitals Corp., et al.*, No. 17-cv-6888, 2020 WL 2999228, at *3 (S.D.N.Y. June 4, 2020))); *Watson v. Geithner*, No. 11-cv-9527, 2013 WL 5441748, at *2 (S.D.N.Y. Sep. 27, 2013) ("[A] party waives any arguments *not* presented to the magistrate judge." (emphasis in original)).

## IV.    DISCUSSION

The Court reviews those portions of the R&R to which no objections were filed for clear error. Those portions include the determination that Plaintiffs' claims should not be dismissed on choice-of-law grounds and the determination that the Amended Complaint adequately alleges extortion. R&R at 25–29. The Court finds no clear error in the R&R's analysis and thus adopts those portions of the R&R.

The Court considers, in the first instance, Defendants' argument in their second motion to dismiss that Plaintiffs are precluded from raising their claims because they fully and fairly litigated the issue of the MCA Agreements in the Receivership Action. The Court also reviews *de novo* those portions of the R&R to which Defendants filed objections. Defendants objected to the R&R's analysis of (1) whether it is plausible that the MCA Agreements were usurious loans, (2) whether

Plaintiffs' claims are time barred, (3) whether Plaintiffs' claims are barred by the PSLRA, and (4) whether Plaintiffs must amend their pleadings consistent with their representations at oral argument.[2]  The Court takes up each of these issues in turn.

### A.  Collateral Estoppel

Because it is not clear that the Receivership Court applied the same legal standard as this Court must when analyzing whether the MCA Agreements are unlawful loans, the Claims Decision does not preclude this action.  "Collateral estoppel, or issue preclusion, prevents parties or their privies from relitigating in a subsequent action an issue of fact or law that was fully and fairly litigated in a prior proceeding." *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 288 (2d Cir. 2002).  "To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Montana v. United States*, 440 U.S. 147, 153–54 (1979).  Issue preclusion can be either "offensive" or, as used here, "defensive." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 326 n.4 (1979).  "Defensive use occurs when a defendant seeks to prevent a plaintiff from asserting a claim the plaintiff has previously litigated and lost against another defendant." *Id.*

The party seeking to invoke collateral estoppel need not have been a party to the first suit. "Under non-mutual collateral estoppel, if a litigant has had an opportunity to fully and fairly litigate an issue and lost, then third parties unrelated to the original action can bar the litigant from relitigating that same issue in a subsequent suit." *GemShares, LLC v. Kinney*, No. 17-cv-844 (CM), 2017 WL 2559232, at *9 (S.D.N.Y. June 2, 2017) (internal quotation marks omitted) (quoting *Austin v. Downs, Rachlin & Martin Burlington St. Johnsbury*, 270 F. App'x 52, 54 (2d Cir. 2008)).

---

[2] Defendants also objected to the R&R's analysis of issue preclusion, Def. Objections at 14–16, but because the Court takes up this issue more fully in addressing Defendants' second motion to dismiss, the Court need not address these objections.  The Court declines to adopt that portion of the R&R analyzing issue preclusion.

"The preclusive effect of a federal court's judgment issued pursuant to its federal-question jurisdiction is governed by the federal common law of preclusion." *Wyly v. Weiss*, 697 F.3d 131, 140 (2d Cir. 2012). Federal preclusion law thus governs this case because the court in the Receivership Action had federal-question jurisdiction over the Receiver's claims determinations.

> Under federal law, collateral estoppel applies when "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits."

*Purdy v. Zeldes*, 337 F.3d 253, 258 (2d. Cir. 2003) (quoting *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir. 1997)). As to the first element, "issues are not identical when the legal standards governing their resolution are significantly different." *Computer Associates Intern., Inc. v. Altai, Inc.*, 126 F.3d 365, 371 (2d Cir. 1997).

The Claims Decision does not state that the Receivership Court found that the MCA Agreements were not usurious loans by a preponderance of the evidence. Claims Decision at 37 (stating only that the Receiver's "ultimate rejection of the merchants' claims" was "reasonable" "by a preponderance of the evidence"). The Receivership Court merely stated that it "carefully reviewed" the Receiver's proposed claim determinations as well as the arguments and facts presented and thereby "determine[d] that the merchants' objections" to the Receiver's claim determinations should be overruled. Claims Decision at 37. The statement that the Receivership Court reviewed the evidence and arguments says nothing about the standard of proof it used to reach its ultimate conclusion. *See Cerny v. Rayburn*, 972 F. Supp. 2d 308, 317 n.4 (E.D.N.Y. 2013) (holding that the plaintiff bore a similar burden of proof in a bankruptcy proceeding because "the preponderance of evidence standard governs decisions whether to revoke a confirmation order due to fraud"); *contra* Dkt. No. 68 at 3–4 ("[C]ontrary to Plaintiffs' unsupported assertion that the [Receivership Court] did not ensure that its rejection of Plaintiffs' arguments regarding the MCA Agreements' validity was

14

legally correct, the [Receivership Court] made clear that it carefully reviewed Plaintiffs' legal arguments regarding the MCA Agreements' validity before rejecting them.").

Importantly, the Claims Decision explicitly states that the Receivership Court used the "fair and reasonable" standard to evaluate the Receiver's claims determinations.[3]  Claims Decision 10–11, 28, 37.  Defendants argue that this standard was used only to approve the Receiver's determinations as to the merchants' claims and not to overrule the merchants' objections.  Dkt. No. 68 at 3.  However, that distinction is not clear from the text of the Claims Decision, which simply stated that "the merchants' objections to the Claims Motion are overruled."  Claims Decision at 37.  The Court's job at this stage is not to infer but to find a "clear" showing from the Claims Decision and the pleadings that collateral estoppel applies.  *Conopco, Inc. v. Roll Int'l*, 231 F.3d 82, 86 (2d Cir. 2000).  Further, the proper standard for "approv[ing] the [Receiver's] plan *over the objection* of certain interested [parties]" is the "fair and reasonable" standard.  *SEC v. Wang*, 944 F.2d 80, 84 (2d Cir. 1991) (emphasis added); *see also SEC v. Byers*, 637 F. Supp. 2d 166, 173 (S.D.N.Y. 2009) ("address[ing] the various objections made to the [p]lan" and "conclud[ing] that the [p]lan is fair and reasonable, with one exception").  Therefore, it is not obvious that the fair and reasonable standard "played little or no role" in the Receivership Court's determination.  Dkt. No. 68 at 4.[4]

Additionally, not only did the Receivership Court not explicitly state the legal standard it employed in reaching its decision regarding the MCA Agreements, but it did not give any reasons or weigh any evidence in the Claims Decision, leaving nothing for this Court to interpret regarding how the decision was reached.  *Donohue Candy and Tobacco Co., Inc. v. Consumer Prod. Distributors, Inc.*, 422 F.

---

[3] The Claims Decision also refers to the standard as "fair and equitable," at 11, and "well supported and reasonable," at 37.

[4] The Court notes that Defendants draw the "little or no role" rule from a case applying New York collateral estoppel law, not federal law.  *Whitfield v. City of New York*, No. 20-cv-4674 (JMF), 2024 WL 5202698, at *5 (S.D.N.Y. Dec. 23, 2024) (citing *Kosakow v. New Rochelle Radiology Associates, P.C.*, 274 F.3d 706, 732 (2d Cir. 2001) (applying New York preclusion law)).

Supp. 3d 637, 646 (E.D.N.Y. 2019) ("[P]laintiffs' assertion of similar legal theories here and in State

court says nothing about why the State court rejected those legal theories.").  Therefore, it is not

"clear from the face of the complaint" or from the judicially noticed materials that the issue

adjudicated in the Receivership Action and the issues presented here are identical.  *Conopco, Inc.*, 231

F.3d at 86.  Dismissal pursuant to Fed. R. Civ. P. 12(b)(6) is therefore inappropriate.  *See id.*; *see also*

*Donohue Candy*, 422 F. Supp. 3d at 647 ("[T]here is no basis for this court to determine whether the

issues in the State court decision and this pending motion are identical.  Defendant's motion to

dismiss on the ground of issue preclusion is therefore denied.").

### B.  Plausible Allegations of Usury

Plaintiffs plausibly allege that the MCA Agreements were unlawful loans.  The R&R rejected

Defendants' arguments that Plaintiffs have failed to allege usury under the applicable state law and

that the Claims Decision renders Plaintiffs' claims implausible.  R&R at 21–28.  The Court adopts

the R&R's analysis and conclusions, with one minor correction noted in footnote 5 below.

### 1.  Plaintiffs' Allegations State a Plausible Claim that the MCA Agreements Constitute Unlawful Loans

Defendants have not objected to the R&R's conclusion that Plaintiffs' allegations in the

Amended Complaint state a plausible claim that the MCA Agreements constitute unlawful, usurious

loans.  When briefing the motion before Judge Ricardo, Defendants failed to rebut that there are

"extensive allegations in the Amended Complaint that the MCA Agreements are unenforceable

loans."  R&R at 24–25.  And Defendants failed to object to the R&R's conclusion that these

allegations themselves would render Plaintiffs' claims plausible.  *Id.*  The Court finds no clear error

in the R&R's treatment of this issue.[5]  Therefore, the Court adopts the R&R's analysis and

---

[5] The R&R does erroneously list six factors "from the Second Circuit . . . to be considered in determining whether a
merchant cash advance agreement is actually a loan."  R&R at 24 (citing *Fleetwood Services, LLC v. Richmond Capital Group
LLC*, No. 22-1885-CV, 2023 WL 3882697, at *2 (2d Cir. June 8, 2023)).  In fact, in the case cited in the R&R, the
Second Circuit listed only *three* factors that "New York courts usually weigh" in making that determination.  *Fleetwood*

conclusion that Plaintiffs plausibly allege in the Amended Complaint that the MCA Agreements are unlawful loans.

As stated above, Defendants have not objected to the R&R's recommendation that the Court at this stage not apply Pennsylvania law, which Defendants argue precludes a claim of usury. Finding no clear error in the R&R's analysis, the Court adopts this portion of the R&R:  it is plausible that the MCA Agreements violated the usury laws of New York, Florida, California, New Jersey, and Massachusetts.  R&R at 27.

### 2. The Claims Decision Does Not Affect This Analysis

Defendants do, however, object to the R&R's conclusion that the Claims Decision does not render Plaintiffs' claims implausible.  Defendants contend that the "necessary implication" of the R&R's recommendation is that Judge Rodolfo and the Receiver are "co-conspirators" in the Enterprise for continuing to enforce collection on the allegedly unlawful debt.  Def. Objections at 14.

This argument, while creatively framed, misses the mark for the same reasons that the Claims Decision does not have preclusive effect.  As the R&R explains, the Receiver is charged with "the protection of the investors." Fla. Dkt. No. 36 at 2; *see SEC v. Byers*, 637 F. Supp. 2d 166, 181 (S.D.N.Y. 2009), *aff'd sub nom. SEC v. Malek*, 397 F. App'x 711 (2d Cir. 2010), and *aff'd sub nom. SEC v. Orgel*, 407 F. App'x 504 (2d Cir. 2010) ("The [r]eceiver is charged with protecting the interests of all investors in the Wextrust entities . . . .  Thus the [r]eceiver not only has the authority, but also the

---

*Services*, 2023 WL 3882697, at *2.  These include "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *Id.* (citing *Principis Cap., LLC v. I Do, Inc.*, 160 N.Y.S.3d 325, 326–27 (2d Dep't 2022)).  The other three factors that Plaintiffs listed in their briefing are cobbled together from a number of cases from New York appellate courts and other courts in this District.  Dkt. No. 46 at 18–19 ("Other non-exhaustive factors include:  (4) whether the agreements identify particular revenue or accounts that were supposedly purchased; (5) whether the merchant is responsible for collect the future receipts; and (6) whether default is declared after just a few missed payments.").  Because this error does not change the ultimate conclusion that Defendants left "completely unrebutted" that "each of these factors weighs in favor of a finding that the MCA Agreements are actually loans," the Court adopts the R&R's conclusion with this simple citation correction.

duty, to assert claims against the Commodity Funds on behalf of the Real Estate Funds investors whose assets were commingled with the Commodity Funds."). Accordingly, the Receiver argued before the Receivership Court in opposition to a request to rule that the MCA Agreements, assets of the Receivership Entities, were usurious loans. Whether the Receiver was right to deny the merchants' claims and collect on the MCA Agreements is not an issue before this Court. Likewise, as discussed above, the Receivership Court approved enforcement and collection of the MCA Agreements under a lesser standard of review than necessary for this action. The Receivership Court's determination may inform this Court's plausibility analysis, but absent a judgment with preclusive effect, this Court must independently assess the plausibility of Plaintiffs' allegations against Defendants in this action. Having done so, the Court agrees with Judge Ricardo that Plaintiffs adequately allege that the MCA Agreements are in fact usurious loans.

### C. Statute of Limitations

Plaintiffs have brought timely civil RICO claims against Defendants. The R&R concludes that the Stay Order plausibly applied to this action and therefore that the statute of limitations on Plaintiffs' claims was tolled. After reviewing Defendants' objections, the Court agrees with the R&R that the Stay Order plausibly applied to this action. This portion of the R&R is therefore adopted. The Court, however, declines to adopt the portion of the R&R that determines which plaintiffs' claims are timely. The Court finds that because Plaintiffs entered into MCA Agreements within four years of issuance of the Stay Order, their claims are timely.

#### 1. Legal Standard

"Generally speaking, 'the lapse of a limitations period is an affirmative defense that a *defendant* must plead and prove.'" *Clark v. Hanley*, 89 F.4th 78, 93 (2d Cir. 2023) (emphasis in original) (quoting *Whiteside v. Hover-Davis, Inc.*, 995 F.3d 315, 319 (2d Cir. 2021)). "The pleading requirements of the Federal Rules of Civil Procedure 'do not compel a litigant to anticipate potential

affirmative defenses, such as the statute of limitations, and to affirmatively plead facts in avoidance of such defenses.'" *Id.* at 93–94 (quoting *Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007)). "Nevertheless, a defendant may raise an affirmative defense in a pre-answer Rule 12(b)(6) motion if the defense appears on the face of the complaint." *Id.* at 94 (quoting *Whiteside*, 995 F.3d at 319). "Dismissal under Rule 12(b)(6) is therefore appropriate only if 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'" *Michael Grecco Productions, Inc. v. RADesign, Inc.*, 112 F.4th 144, 150 (2d Cir. 2024) (quoting *Sewell v. Bernardin*, 795 F.3d 337, 339 (2d Cir. 2015)).

### 2. The Stay Order Tolled the Statute of Limitations for Plaintiffs' Claims

Because the Stay Order applied to Plaintiffs' claims in this action, the Stay Order tolled the statute of limitations for Plaintiffs' claims. The Stay Order applied to civil proceedings "involving . . . any of [CBSG's] . . . agents . . . sued for, or in connection with, any action taken by them while acting in such capacity." Stay Order at 4. Defendants object to the R&R's conclusion that "the Chehebars, for the reasons alleged in the Amended Complaint, were 'agents' of CBSG." R&R at 16. Defendants point to the consulting agreements between the Chehebars and CBSG, which state that the Chehebars "will act strictly in a professional consulting capacity as an independent contractor for all purposes." Dkt. No. 38-4 at 2, 11.

While the consulting agreements do purport to establish an "independent contractor" relationship, they do not, as Defendants contend, disclaim an *agency* relationship. *See* Def. Objections at 6. "[A]n independent contractor may also be an agent"; "the two terms are not mutually exclusive." *U.S. v. Thomas*, 377 F.3d 232, 238 (2d Cir. 2004) (citing Restatement (Second) of Agency § 14N (1958)); *see also Burrell v. Sowers*, No. 22-2687, 2023 WL 7320867, at *2 (2d Cir. Nov. 7, 2023) (holding that independent contractors were covered under a general release applying to "agents" because the principal "exerted significant control over" them); Restatement (Third) of

Agency § 1.01(c) (2006) ("[S]ome termed independent contractors are agents while others are nonagent service providers."). "The law of agency distinguishes between employees (or 'servants') and independent contractors." *Royal Ins. Co. of Am. v. RU-VAL Elec. Corp.*, 918 F. Supp. 647, 652 (E.D.N.Y. 1996) (citing Restatement (Second) of Agency § 220 (1958)). "Both employees and independent contractors are agents, but whether a party is one form of agent or the other will often determine liability." *Id.* As the R&R concludes, the Amended Complaint and the exhibits attached thereto plausibly allege that the Chehebars were agents of CBSG: the Chehebars contracted to render consulting services on behalf of CBSG. *See* Dkt. No. 38-4. Besides pointing to the consulting agreements' invocation of the term "independent contractor," Defendants offer no other argument for why the Court should not consider the Chehebars agents of CBSG. Therefore, the Court adopts the portion of the R&R that holds that the Stay Order plausibly tolled the statute of limitations on Plaintiffs' claims.[6]

### 3. Plaintiffs' Claims Are Not Time Barred

The Court declines to adopt the portions of the R&R that assess when Plaintiffs' claims accrue; accordingly, this Court will undertake this analysis *de novo*. Because the Stay Order tolled the statute of limitations on Plaintiffs' claims, the claims of the plaintiffs who have alleged that they entered into an MCA Agreement after July 31, 2016 are timely. The Stay Order took effect on July 31, 2020, and was not lifted prior to the commencement of this action. Fla. Dkt. No. 56; Dkt. Nos.

---

[6] Defendants argue in their reply brief to the objections that "because Plaintiffs acted in contravention of the purportedly 'plain terms'" of the Stay Order, Plaintiffs should not be given the benefit of tolling. Dkt. No. 69 at 1–2. However, Defendants provide no case law in support of the proposition that Plaintiffs can waive tolling by violating a stay order.

Additionally, Plaintiffs raise the issue of equitable tolling for the first time in their response to the Def. Objections. *See* Pl. Response at 8–12. Because this issue was not raised before Judge Ricardo, nor was it raised as an objection to the R&R, the Court declines to consider this new issue. *See Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 766 (2d Cir. 2002) ("Where parties receive clear notice of the consequences, failure timely to object to a magistrate's report and recommendation operates as a waiver of further judicial review of the magistrate's decision."); *Watson v. Geithner*, No. 11-cv-9527, 2013 WL 5441748, at *2 (S.D.N.Y. Sep. 27, 2013) ("[A] party waives any arguments *not* presented to the magistrate judge." (emphasis in original)). In any event, the Court need not reach the issue of equitable tolling because the Court holds that Plaintiffs have adequately pleaded that the Stay Order tolled the statute of limitations for their claims.

1, 61-34.  The parties agree that there is a four-year statute of limitations period for Plaintiffs' civil RICO claims.  *See Agency Holding Corp. v. Malley–Duff & Assocs.*, 483 U.S. 143, 156 (1987).  Therefore, for Plaintiffs' claims to be timely, Plaintiffs' claims must have accrued after July 31, 2016.

"[E]ach time a plaintiff suffers an injury caused by a violation of 18 U.S.C. § 1962, a cause of action to recover damages based on that injury accrues to plaintiff at the time he discovered or should have discovered the injury."  *Bankers Tr. Co. v. Rhoades*, 859 F.2d 1096, 1102 (2d Cir. 1988).  "[W]hen a new and independent injury is incurred from the same violation, the plaintiff is again injured . . . and his right to sue for damages from that injury accrues at the time he discovered or should have discovered that injury."  *Id.* at 1103.  "But, 'allegations of 'new and independent' injuries cannot depend on injuries that are derivative of the core injury sustained.'"  *Tech. Opportunity Group, Ltd. v. BCN Telecom, Inc.*, No. 16-cv-9576 (KMK), 2019 WL 4688628, at *6 (S.D.N.Y. Sept. 25, 2019) (quoting *World Wrestling Ent., Inc. v. Jakks P., Inc.*, 530 F. Supp. 2d 486, 524 (S.D.N.Y. 2007), *aff'd*, 328 F. App'x 695 (2d Cir. 2009)).

Each time Plaintiffs entered into an allegedly unlawful MCA Agreement, a new RICO claim against Defendants accrued.  Plaintiffs "sustained their alleged injuries when they assumed these loan obligations" with unlawful terms.  *Simmons v. Reich*, No. 20-4114, 2021 WL 5023354, at *2 (2d Cir. Oct. 29, 2021) (summary order) ("Plaintiffs allege that the [l]enders fraudulently misled them into taking out loans with illegally high interest rates and improper fees.  Plaintiffs thus sustained their alleged injuries when they assumed these loan obligations."); *see also Moss v. First Premier Bank*, No. 13-cv-5438 (BMC), 2024 WL 4274780, at *4 (E.D.N.Y. Aug. 2, 2024) ("RICO plaintiffs suffer their injuries when they enter into an agreement to take out a usurious loan." (citing *Simmons*, 2021 WL 5023354, at *2)).  And because Plaintiffs "undertook a new obligation to repay a new debt with each loan," each new MCA Agreement "constitute[s] a new and independent injury from [the]

prior" agreements. *Moss*, 2024 WL 4274780, at *5.[7]

Because Plaintiffs B&T, Mr. Odzer, RKDK, Gelato, ASB, Mr. Shah, MHMSG, Mr. Heller, The Perfect Impression Inc., and Susan Abrahams plausibly allege that they entered into new MCA Agreements after July 31, 2016, their claims are timely. *See* Am. Compl. ¶¶ 121, 129–30, 135–36, 146, 149, 169–70.[8] By contrast, the Amended Complaint does not state when Plaintiffs TourMappers North America LLC ("TourMappers") and Julie Katz entered into MCA Agreements. The Amended Complaint simply states that TourMappers and Ms. Katz bring this action on behalf of similarly situated merchants and individuals in Massachusetts who "paid money pursuant to" or "guaranteed" a CBSG MCA Agreement "on or after August 13, 2016." Am. Compl. ¶¶ 185–86. While these statements imply that TourMappers *paid* CBSG pursuant to an MCA Agreement after July 31, 2016, these statements do not allege that either TourMappers or Ms. Katz *entered into* the MCA Agreements after that date. However, the burden is not on TourMappers or Ms. Katz to allege that their claims fall within the statute of limitations period; rather, the burden is on Defendants to show that "it is clear from the face of the complaint and matters of which the court may take judicial notice" that their claims do not. *Michael Grecco*, 112 F.4th at 150. Defendants fail to demonstrate that the Amended Complaint or judicially noticeable materials clearly show that

---

[7] While Plaintiffs argue that their claims accrued not when they entered the MCA Agreements but at "each separate collection of unlawful debt," Pl. Response at 12 n.2, "collection of debt does not constitute a 'new and independent' violation vis-à-vis entering the agreement," *Moss*, 2024 WL 4274780, at *4. *See also In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 60 (2d Cir. 1998) ("Collection [of annual fees] in later years cannot be viewed as a separate and distinct fraud creating new injuries as it was simply a part of the alleged scheme."); *Tech. Opportunity Group*, 2019 WL 4688628, at *7 (collecting cases) ("Courts in the Second Circuit routinely hold that subsequent payments in furtherance of a single scheme are not new and independent injuries."); *Simmons*, 2021 WL 5023354, at *3 ("But while Plaintiffs argue that they suffered 'new and independent' injuries within the limitations period in the form of foreclosure proceedings, threats of eviction, and the continuing obligation to make 'exorbitant payments,' these events are clearly derivative of the allegedly fraudulent mortgage agreements." (citations omitted)).

[8] The R&R seems to erroneously presume that Plaintiffs' claims accrue when they entered into their *first* MCA Agreement. *See* R&R at 8–9 & n.3. For example, the R&R determined that B&T's claims would be time-barred absent tolling because it "entered into MCA Agreements before December 28, 2019." *Id.* at 8; *see id.* at 9 n.3 (referencing only the "2015 MCA Agreement by B and T"). However, the Complaint alleges that B&T entered into a new MCA Agreement as late as July 17, 2020. Am. Compl. ¶ 135.

neither TourMappers nor Ms. Katz entered an MCA Agreement after July 31, 2016.[9]  Therefore

Plaintiffs' claims are timely.

### D.  PSLRA Bar

On the record at this stage of the action, the PSLRA does not bar Plaintiffs' claims because,

as the R&R concludes, the alleged conduct underlying Plaintiffs' claims is not actionable as securities

fraud.  Section 107 of the PSLRA, often referred to as the "RICO Amendment," provides that "no

person may rely upon any conduct that would have been actionable as fraud in the purchase or sale

of securities to establish a violation of section 1962."  18 U.S.C. § 1964(c).  The RICO Amendment

thus "bars civil RICO claims alleging predicate acts of securities fraud."  *MLSMK Inv. Co. v. JP*

*Morgan Chase & Co.*, 651 F.3d 268, 277 (2d Cir. 2011).  "The amendment sought to 'prevent litigants

from using artful pleading to boot-strap securities fraud cases into RICO cases, with their threat of

treble damages.'"  *D'Addario v. D'Addario*, 75 F.4th 86, 93 (2d Cir. 2023) (quoting *MLSMK*, 651 F.3d

at 274).

As far as Plaintiffs have alleged, the conduct described in the Amended Complaint relates

solely to the unlawful loans, not to the securities fraud adjudicated in the Receivership Action.  The

predicate acts involve the collection of unlawful debt, Am. Compl. ¶¶ 65–70; extortionate collection

of debt, *id.* ¶ 78–89; and obstruction of justice, *id.* ¶¶ 90–114.  None of these predicate acts involve

the purchase or sale of securities.  Defendants are simply incorrect that Plaintiffs' allegations relate

to "investing in CBSG's securities fraud Ponzi scheme" and "recruiting other investors to put

---

[9] In any event, in briefing Defendants' objections, Plaintiffs provide an MCA Agreement between CBSG, TourMappers, and Ms. Katz dated January 10, 2020.  Dkt. No. 61-25.  While the Court does not condone incomplete pleadings and *ex post* attachments to a party's briefing, the Court could in this case consider the attached MCA Agreement at Dkt. No. 61-25 as "'integral' to the complaint."  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002).  Plaintiffs' claims are exclusively based on the MCA Agreements; Plaintiffs "relie[d] heavily on [their] terms and effect," *id.*, "in framing the complaint," *Walter v. Queens College*, 390 F. Supp. 3d 382, 393 (E.D.N.Y. 2019) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 44 (2d Cir. 1991)).  Thus, while the Court need not consider the attached MCA Agreement because Defendants have not met their burden at this stage, Plaintiffs have provided documentation integral to the Amended Complaint that supports the conclusion that TourMappers and Ms. Katz entered into an MCA Agreement after July 31, 2016, and therefore that their claims are also timely.

money into CBSG's securities fraud Ponzi scheme." Def. Objections at 9. To the contrary, the very paragraphs Defendants cite allege that Defendants invested in the Enterprise "to fund the criminally usurious loans," which are distinct from CBSG's Ponzi scheme. Am. Compl. ¶ 7; *see also id.* ¶ 9 ("The capital provided by the Chehebars was a private family affair wherein the Chehebar family sought to reap millions of dollars from their willful and knowing participation in the Enterprise's illegal loansharking scheme."); *id.* ¶¶ 10–23. It is of no consequence whether "the Chehebars invested in CBSG's securities," Def. Objections at 9–10, because the purchase of those "securities"—only alleged to be promissory notes[10]—is not what is alleged to be fraudulent in this case. *See D'Addario*, 75 F.4th at 93 ("[F]or a claim to be barred, the fraud must be *in* the purchase or sale of securities, which means that the actual purchase or sale of securities was fraudulent; it is not enough for securities to be an incidental feature of an overall scheme." (emphasis in original) (internal quotation marks omitted)). "The RICO Amendment . . . must not be construed so broadly as to bar RICO claims based on common law frauds that happen to involve securities." *Id.* at 93. Plaintiffs' allegations do not support the argument that Defendants' conduct regarding the MCA Agreements would itself be "prosecuted as securities fraud." *Picard v. Kohn*, 907 F. Supp. 2d 392, 398 & n.2 (S.D.N.Y. 2012) (where the defendants attracted investors into a Ponzi scheme).[11]

Defendants are not aided by the footnote in *MLSMK* stating that "conduct undertaken to keep a securities fraud Ponzi scheme alive is conduct undertaken in connection with the purchase

---

[10] *See Reves v. Ernst & Young*, 494 U.S. 56, 66 (1990) (setting out the test for whether an instrument denominated a "note" is in fact a "security").

[11] While Defendants correctly cite *MLSMK* for the proposition that the RICO Amendment applies "even where a plaintiff cannot itself pursue a securities fraud action against the defendant," 651 F.3d at 277, that does not mean that the RICO Amendment applies where *no one* could bring a securities fraud claim against the defendant. Indeed, *MLSMK* reiterates that the RICO Amendment applies where a plaintiff alleges "predicate acts of securities fraud" that would be "*actionable*." *Id.* at 277 (emphasis added) (quoting 18 U.S.C. § 1964(c)). Thus, contrary to Defendants' objections, the R&R is correct to analyze Plaintiffs' alleged injuries because Plaintiffs are alleging that Defendants' injurious conduct related to the unlawful loans, and therefore Defendants' conduct is not alleged to be actionable as securities fraud. As the R&R states, "Plaintiffs' claims do not fall within the RICO Amendment because they do not rely on conduct that would have been actionable—by someone—as fraud in the purchase or sale of securities." R&R at 20.

and sale of securities." *MLSMK*, 651 F.3d at 277 n.11.  First, there is no allegation in the Amended Complaint that the Chehebars' investment "for these criminally usurious loans," Am. Compl. ¶ 13, was "undertaken to keep CBSG's securities fraud Ponzi scheme alive," Def. Objections at 12. Defendants urge the Court to consider the "judicially noticeable facts from the Receivership Action," *id.*, but such facts fail to demonstrate that the allegedly unlawful loans were undertaken to keep the Ponzi scheme alive.  Quite the opposite:  the Receivership Court found that CBSG's securities fraud was undertaken to "fuel the[] merchant cash advances."  Claims Decision at 2–3.

Second, Defendants' reading of the *MLSMK* footnote is too broad.  As discussed in the R&R, in all the cases cited by Defendants, the conduct that kept Ponzi schemes "alive" involved attracting investors to the Ponzi scheme or aiding the scheme with market-making to facilitate the sale of securities—in other words, a direct connection to the scheme.  *See MLSMK*, 651 F.3d at 272–73 (where the predicate acts included "providing Madoff with banking services that were integral to the functioning of the racketeering enterprise"); *Sell v. Zions First Nation Bank*, No. 05-cv-0684 (PHX) (SRB), 2006 WL 322469, at *10 (D. Ariz. Feb. 9, 2006) (holding that "disbursement of money from more recent investors to older investors is the hallmark of the scheme" and therefore "in connection with securities fraud"); *Bald Eagle Area Sch. Dist. v. Keystone Fin., Inc.*, 189 F.3d 321, 330 (3d Cir. 1999) (holding that conduct was in connection with securities fraud where the perpetrator's "misrepresentation[s]/omission[s] induced new investments").  While Defendants fail—in every round of briefing—to explain how the allegedly usurious loans kept CBSG's scheme alive, at best one might infer that the profits earned from the MCA Agreements helped fund CBSG's scheme.[12]  As the R&R concludes, this relationship is far too "attenuated" to be considered actionable participation in securities fraud.  R&R at 19.  This argument is much more akin to the argument that the RICO Amendment applies where defendants "invested the proceeds of armed

---

[12] Even though, again, the Receivership Court found the opposite to be true.  *See* Claims Decision at 2–3.

robbery in Madoff Securities." *Picard v. Kohn*, 907 F. Supp. 2d 392, 398 n.2 (S.D.N.Y. 2012) (rejecting that argument where the money invested was obtained by "engaging in conduct that could be prosecuted as securities fraud").

The only "connection" between the loan scheme and the Ponzi scheme is that CBSG facilitated both and reaped the profits of each.[13] *See Stevenson v. Thornburgh*, No. 23-cv-4458 (CM), 2024 WL 645187, at *19 (S.D.N.Y. Feb. 14, 2024) ("Under Section 10(b), the determination of whether conduct is actionable as securities fraud focuses on whether the fraudulent conduct is 'in connection with the purchase or sale of any security.'" (quoting 15 U.S.C. § 78j(b)). That does not mean Defendants "could be prosecuted [for] securities fraud" for their engagement in the former. *Picard*, 907 F. Supp. 2d at 398 n.2; *see* 18 U.S.C. § 1964(c) (applying to "conduct that would have been actionable as fraud in the purchase or sale of securities"). For these reasons, the Court adopts the portion of the R&R that concludes that the PSLRA does not bar Plaintiffs' claims at this stage.

### E. *Rooker-Feldman* Doctrine, *Res Judicata*, and Further Amending the Pleadings

As explained in the R&R, Plaintiffs' representations to Judge Ricardo at oral argument obviate the need to dismiss the Amended Complaint on the basis of the *Rooker-Feldman* doctrine or *res judicata*. *See* R&R at 29–31. Defendants do not object to this conclusion. *See* Def. Objections at 17. Defendants simply request that "Plaintiffs amend their pleadings to be consistent with the

---

[13] The S.D.N.Y. cases cited by Defendants to argue that the Amended Complaint "alleges a single, ongoing fraudulent scheme" are distinguishable. *Zohar CDO 2003-1, Ltd. v. Patriarch Partners, LLC*, 286 F. Supp. 3d 634, 648 (S.D.N.Y. 2017). In *Zohar*, the defendants committed securities fraud *by* breaching the duty of loyalty to the plaintiff. *Id.* at 649 ("The purchase of stock was integral to the scheme to defraud since, without it, Defendants would have lacked the position to claim dividends and exercise control over the portfolio companies."). Here, by contrast, the two fraudulent schemes were executed separately, even if one enterprise. And in *Gilmore*, the court found that the defendants engaged in a "single scheme" aimed to "loot Covington and the other family corporations." *Gilmore v. Gilmore*, No. 09-cv-6230 (WHP), 2011 WL 3874880, at *6 (S.D.N.Y. Sept. 1, 2011), *aff'd*, 503 F. App'x 97 (2d Cir. 2012), and *aff'd*, 503 F. App'x 97 (2d Cir. 2012). By contrast, here, the Ponzi scheme targeted investors of CBSG's unregistered securities, and the MCA Agreements targeted merchant customers; these were not unified schemes with a single purpose, as evidenced by the fact that the Receiver denied the merchants' claims when making a distribution plan for the victims of CBSG's Ponzi scheme.

representations their counsel made at oral argument." *Id.* "Plaintiffs are willing to make this amendment." Pl. Response at 19. The Court therefore orders that Plaintiffs file an amended complaint no later than March 31, 2025, to reflect that Plaintiffs do not have an outstanding confession of judgment and that, should a class be certified, the prospective class would not include any individual or business with an outstanding confession of judgment.

## V.    CONCLUSION

For the foregoing reasons, the Court adopts the R&R in part and modifies the R&R in part. Plaintiff's claims are plausibly pleaded, not time barred, and not barred by the PSLRA. Further, the Court orders Plaintiffs to file an amended complaint no later than March 31, 2025, for the sole purpose, described in Section IV.E above, of mooting any *Rooker-Feldman* or *res judicata* concerns. Therefore, Defendants' first motion to dismiss is DENIED. The Court also holds that Plaintiffs are not precluded from litigating the issue of whether the MCA Agreements are usurious loans because the Receivership Court addressed this issue under a different legal standard. Therefore, Defendants' second motion to dismiss is DENIED. The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 43, 59.

SO ORDERED.

Dated:  March 17, 2025
       New York, New York

                                                              GREGORY H. WOODS
                                        United States District Judge